738 A.2d 435

COMMONWEALTH of Pennsylvania, Appellee,

v.

Saharris ROLLINS, Appellant.

Supreme Court of Pennsylvania.

Submitted March 1, 1999.

Decided Sept. 29, 1999.

Reargument Denied Nov. 12, 1999.

534

536

Edward M. Dunham, Philadelphia, Daniel W. Cantu'-Hertzler, Robert Brett Dunham, Philadelphia, for Saharis Rollins.

Catherine Marshall, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

**OPINION**

CAPPY, Justice.

Saharris Rollins ("Appellant") appeals from the denial of his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* For the reasons that follow, we affirm.[1]

The facts of this matter are laid forth in detail in this court's opinion on direct appeal. *Commonwealth v. Rollins,* 525 Pa. 335, 580 A.2d 744 (1990). In brief, Appellant arrived at the home of Violeta Cintron ("Violeta") at approximately one o'clock in the morning on January 22, 1986. Appellant had come to Violeta's house looking for Violeta's husband, Jose Carrasquillo ("Carrasquillo") with whom Appellant had conducted drug deals in the past. Appellant requested some cocaine from Violeta. When Violeta was about to hand over the cocaine, however, Appellant announced that he wished to trade methamphetamine for the cocaine rather than pay cash. Violeta refused this offer, and Appellant left the premises.

Appellant returned to Violeta's house a few minutes later, this time armed with an automatic handgun and demanded the cocaine from Violeta. Raymond Cintron ("Raymond"), Violeta's brother, dropped Violeta's one year old son whom he had been holding and began wrestling with Appellant for control of the gun. Several shots were fired in the ten by eleven foot room, hitting Raymond as well as a stereo speaker, a lamp and a wall. Raymond fell to the floor after which Appellant picked him up and fired more shots into Raymond's body. Appellant fled the scene. While fleeing, Appellant came face-to-face with Dalia Cintron ("Dalia"), one of Violeta's sisters, and pointed his gun at her as he made his escape. Raymond subsequently died from these gunshot wounds.

Appellant was arrested three days after he killed Raymond as the result of his involvement in another shooting incident. On January 25, 1986, Appellant arrived at the home of Richard Campbell ("Campbell"). Campbell, who had been warned

---

1. Where post-conviction relief has been denied in a death-penalty case, the matter is directly reviewable by this court. 42 Pa.C.S. § 9546(d).

of Appellant's arrival, greeted Appellant with a shotgun; a gunfight immediately ensued in which Appellant was wounded. Appellant was picked up by police a short distance from the Campbell residence. Ballistic tests later revealed that the weapon Appellant used in the Campbell shooting was the same one used to kill Raymond.

Appellant was tried before a jury for crimes stemming from the shooting of Raymond; he was found guilty of murder in the first degree, robbery and possession of an instrument of crime. A penalty hearing was subsequently convened. The jury found two aggravating circumstances: that the killing was committed while in the perpetration of another felony,[2] and the killing created a grave risk of harm to others.[3] The jury also found one mitigating circumstance: that Appellant had no significant history of prior criminal convictions.[4] The jury determined that the aggravating circumstances outweighed the mitigating circumstance and sentenced Appellant to death. This court affirmed the judgment of sentence on direct appeal. *Rollins, supra.*

Appellant next filed the instant PCRA petition on November 12, 1996 which the PCRA court denied without holding a hearing.[5]

The appeal to this court then followed. His first claim is that the PCRA court erred when it denied him relief without a hearing. Appellant acknowledges that a PCRA judge may dispose of a PCRA petition without a hearing pursuant to

2. 42 Pa.C.S. § 9711(d)(6).

3. 42 Pa.C.S. § 9711(d)(7).

4. 42 Pa.C.S. § 9711(e)(1).

5. Pursuant to the newly amended PCRA, in order to be considered timely, PCRA petitions must be filed within one year of the date that the judgment becomes final. 42 Pa.C.S. § 9545(b)(1) (amendments effective January 16, 1996). There is an exception to that rule, however, which states that even if it is not filed within one year of the date that the judgment becomes final, a first PCRA petition is still timely so long as it is filed within one year of the PCRA amendments becoming final— to wit, within one year of January 17, 1996. *Commonwealth v. Peterkin*, 554 Pa. 547, 722 A.2d 638, 641 (1998). As this is Appellant's first PCRA petition, and it was filed within one year of January 17, 1996, it is timely.

Pa.R.Crim.P. 1507(a) when the petition raises no "genuine issues concerning any material fact. . . . "[6] Yet, he contends that the PCRA judge below erred as this petition did indeed raise such genuine issues of material fact. Appellant baldly contends that the issues he raises in his voluminous brief will support his contention. As we find that none of these issues, which will be discussed in full *infra,* raises a genuine issue of material fact, we deny Appellant's first claim.

■ Appellant's remaining claims are of trial court error, prosecutorial misconduct, and ineffective assistance of counsel. As Appellant's issues of trial court error and prosecutorial misconduct were not raised on direct appeal, they are waived. *See Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 700 (1998). The only issues that remain are the claims of ineffective assistance of counsel.[7]

■ As the starting point for our review of an ineffective assistance of counsel claim, we presume that counsel is effective. *Commonwealth v. Cross,* 535 Pa. 38, 634 A.2d 173 (1993). To overcome this presumption, Appellant must establish three factors. First, he must show that the underlying claim has arguable merit. *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 356 (1995). Second, Appellant must prove that counsel had no reasonable basis for his action or inaction. *Id.* In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987). Finally, Appellant must establish that he has been prejudiced by counsel's ineffectiveness; in order to meet this burden, he must show that "but for the act or omission in

6. Effective August 11, 1997, Pa.R.Crim.P. 1509 governs procedures for PCRA petitions in death penalty cases.

7. We note that Appellant has properly "layered" all of his ineffectiveness claims, alleging that all prior counsel were ineffective for failing to assert claims of trial counsel's ineffectiveness. *See Commonwealth v. Chmiel,* 536 Pa. 244, 639 A.2d 9, 12 (1994) (requiring the proper layering of ineffectiveness claims).

question, the outcome of the proceedings would have been different." *Travaglia,* 661 A.2d at 357. "If it is clear that Appellant has not met the prejudice prong of the ineffectiveness standard, the claim may be dismissed on that basis alone and the court need not [initially] determine whether the first and second prongs have been met." *Id.*

 Appellant's first ineffectiveness claim is a broad one. He contends that the inexperience of his trial counsel, in itself, is sufficient to establish that counsel was ineffective. We reject this claim as we have previously stated that the mere inexperience of counsel is not equivalent to ineffectiveness. *Commonwealth v. Williams,* 537 Pa. 1, 640 A.2d 1251, 1264 (1994). Rather, Appellant must make out all three prongs of an ineffectiveness claim in order to be granted relief.

 Appellant next raises a series of ineffectiveness claims related to the selection of his jury. His first such claim is that trial counsel failed to "life-qualify" the jurors.[8] Although trial counsel is permitted to life qualify the jury, "such questions ... are not required and counsel is not ineffective for failing to pose them." *Commonwealth v. Hardcastle,* 549 Pa. 450, 701 A.2d 541 (1997). Furthermore, where counsel fails to life-qualify jurors, counsel is not ineffective where jurors assured counsel and the court they would follow the dictates of the law. *Commonwealth v. Carpenter,* 533 Pa. 40, 617 A.2d 1263, 1269 (1992).

 Appellant claims that by failing to life-qualify the jury, counsel allowed an unfair and partial jury to be impaneled. Appellant identifies four jurors who expressed beliefs which should have indicated to counsel that they were biased. Appellant's ineffectiveness claim must fail since all of these jurors stated that they could decide this matter fairly in accordance with the law. N.T. 2/17/87 at 683 (Juror Mary McMenamin) and at 730 (Juror Helen Megrail); N.T. 2/18/87

8. "Life-qualifying" a juror refers to the process by which counsel identifies and excludes prospective jurors who have a fixed opinion that a sentence of life imprisonment should not be imposed for a conviction of first degree murder. *Morgan v. Illinois,* 504 U.S. 719, 735–36, 112 S.Ct. 2222, 2227, 119 L.Ed.2d 492, 507 (1992).

at 773 (Juror Malaysia Williams) and at 872–873 (Juror Charles Hengstler). Thus, pursuant to *Carpenter, supra,* counsel was not ineffective.

Next, Appellant contends that trial counsel was ineffective in exercising his peremptory strikes where he should have instead struck the jurors for cause, thus preserving his peremptory strikes. Of the twenty-one peremptory strikes that Appellant utilized[9], Appellant contends that five jurors indicated that they had drug-related biases that would affect their ability to determine the matter and thus could have been stricken for cause. Appellant is incorrect. All five of these jurors indicated that they could be fair and impartial and would not decide to convict Appellant merely because of the drug-related nature of this crime. N.T. 2/10/87 at 184–185 (venireperson Charles Rudio); N.T. 2/11/87 at 320–21 (venireperson Theresa Pirrone); N.T. 2/13/87 at 477–79 (venireperson Joanne Marks) and at 511 (venireperson Drew Mihicko); N.T. 2/18/87 at 786–87 and 794–95 (venireperson William Stone). Thus, this claim has no merit.

Next, Appellant claims that counsel was ineffective for failing to pursue the claim that the trial court judge erred when he struck five prospective jurors for cause due to their inability to follow the law regarding the death penalty. It is within the trial court's discretion to strike a juror for cause, and such a decision will not be disturbed absent a showing of abuse of discretion. *Commonwealth v. Fisher,* 545 Pa. 233, 681 A.2d 130 (1996).

All five jurors indicated that their views on the death penalty were such that they would be unable to apply the law as instructed to them by the judge. N.T. 2/13/87 at 427–28 (venireperson Regina Waiters) and at 458–59 (Ruth McAdams) and at 492–95 (venireperson Florine Freeland); N.T. 2/18/87 at 765–66 (Alan Solomon) and at 806–08 (John Bazzani). It is axiomatic that where a prospective juror

9. Although Pa.R.Crim.P 1126(a)(3) limits the defendant in a death penalty case to twenty peremptory strikes, Appellant was allowed twenty-one peremptory strikes.

expresses views that would "prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his instructions and his oath," that venireperson may be dismissed for cause. *Commonwealth v. Holland*, 518 Pa. 405, 543 A.2d 1068, 1073 (1988) (citing *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Appellant argues, however, that it was error for the trial court not to allow the rehabilitation of these venirepersons so that it could have been established that they could have performed their duty as jurors in accordance with the law. The law, however, imposes no such duty on the trial court. *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 354 (1998) (the trial court does not have a duty to rehabilitate a potential juror where it appears that the potential juror would not be able to follow the instructions on the law). Thus, this claim must be denied.

■ Next, Appellant contends that counsel was ineffective for failing to raise the claim that the Commonwealth exercised its peremptory strikes in a racially discriminatory manner, thus violating the dictates of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To establish that this claim has any merit, Appellant must establish a *prima facie* case of improper use of peremptory challenges. In order to do so, the defendant must establish that

(1) the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; (2) the defendant can then rely on the fact that the use of peremptory challenges permits "those to discriminate who are of a mind to discriminate"; and (3) the defendant, through facts and circumstances, must raise an inference that the prosecutor excluded members of the venire on account of their race. The third prong requires defendant to make a record specifically identifying the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense.

*Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468, 475 (1998) (citing *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 631 (1995)).

In the matter *sub judice,* Appellant attempts to meet this burden by contending that "[m]ore than half of the peremptories used by the prosecutor—including the first seven—served to exclude African Americans from service on the jury, for no apparent reason other than their race...." Appellant's brief at 28. This claim must fail. Appellant's myriad citations to the record in support of this claim reveals the race of only one of the venirepersons whom the Commonwealth peremptorily struck. N.T. 2/11/87 at 243 (venireperson Lucille Goldsmith, an African–American). Clearly, this does not meet Appellant's burden to identify specifically "the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense." *Thomas,* 717 A.2d at 475. Thus, this claim fails as it lacks merit.[10]

In a related issue, Appellant makes the novel claim that his own counsel violated *Batson* when he exercised peremptory strikes in a racially discriminatory fashion, and thus provided him with ineffective assistance of counsel. As noted above, Appellant has not shown "the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense" as required by *Thomas, supra.* Thus, this *Batson* claim fails as well.

Appellant's final ineffectiveness claim relating to voir dire is that his trial counsel ineffectively implied to prospective jurors that the only biases which were relevant were the ones which

---

**10.** Appellant also claims that the existence of a training tape created by then-Assistant District Attorney Jack McMahon (who did not prosecute Appellant) in 1987, which instructed prosecutors to manipulate the jury selection process in order to minimize the seating of African–American jurors, supports his *Batson* claim. Appellant is incorrect as the existence of the tape does not demonstrate that there was discrimination in *his* case. The existence of this tape in no fashion can be seen to relieve the burden Appellant carries pursuant to *Batson*—a burden which he has failed to meet.

could affect the guilt phase, and it was unimportant whether the venirepersons had biases with respect to the penalty phase. Our review of the record establishes that this claim is groundless. Thus, Appellant's ineffectiveness claim must fail.

 Appellant's next ineffectiveness claim concerns a suppression issue. Appellant asserts that counsel was ineffective for failing to pursue the claim that identification testimony of several witnesses of the Campbell shooting should have been suppressed as it was the result of an extremely suggestive show-up.[11] Even assuming *arguendo* that the show-up was suggestive, that would still not preclude the admission of this identification testimony. Rather, the query is whether there exists a basis for identification which is independent of the allegedly suggestive show-up. The factors to be considered in such a query are: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 71 (1994). Here, the witnesses all had ample opportunity to observe Appellant in a well-lit location and identified him at the hospital only a couple of hours after the shooting. Appellant points to nothing in the record which would indicate that the witnesses' identifications were anything but certain. Finally, it is reasonable to assume that witnesses to a gun battle would be attentive to their surroundings. Thus, as we cannot say that the trial judge abused his discretion when he denied this suppression motion, this claim has no merit.

 Appellant's next series of ineffectiveness claims relate to alleged incidents of prosecutorial misconduct during the guilt phase of the trial. In order to establish that these claims have merit, Appellant must show that "the unavoidable effect of the contested comments was to prejudice the jury,

---

11. A "show-up" is a one-on-one identification procedure between the witness and the suspect. *Black's Law Dictionary* 962 (6 th ed.1991).

forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury." *Travaglia*, 661 A.2d at 360–61 (citations omitted).

Appellant's first ineffectiveness claim relative to the prosecutor's alleged misconduct concerns statements made by the prosecutor in his opening statement. Appellant claims that the prosecutor made statements which communicated to the jury that his personal belief was that the Commonwealth's witnesses were credible and that Appellant was guilty. Appellant, citing *Commonwealth v. Gilman*, 470 Pa. 179, 368 A.2d 253, 259 (1977), states that a prosecutor is forbidden to express a personal opinion about a defendant's guilt or the credibility of a witness, and that where he does, the conviction should be reversed and a new trial awarded.

Appellant's statement of the law is correct: a prosecutor may not offer his personal beliefs concerning the case to the jury. Yet, this standard avails Appellant nought as a review of the complained of statements reveals that the prosecutor in this matter did not cross into this forbidden territory. In the first complained of statement, the prosecutor was merely informing the jury of the role of a prosecutor, stating that a prosecutor is not

> like a bounty hunter, that [he does not] get paid for the convictions. . . . [T]he oath that I swore as an attorney and as a person was to seek justice in every case. Sometimes that means not guilty in certain cases and sometimes that means standing before a jury such as yourselves and seeking to persuade you through evidence and under the law that an individual who is charged, as [Appellant] is charged, did in fact commit the crimes and should be found guilty.

N.T. 2/19/87 at 29. We can discern no impropriety in this comment.

■ In the next complained of passage from the Commonwealth's opening statement, the prosecutor proclaimed to the jury that "I say very solemnly, because what is ultimately proven in this case is not what I think is proven. It's what you collectively and individually believe is proven. So I'm not going to invade your jury box. . . . But I am permitted to tell you what I expect to prove, and I can tell you that because I've spoken to the witnesses and I've reviewed this case very carefully." N.T. 2/19/96 at 36–37. Rather than improperly giving the jury his personal view of Appellant's guilt, as Appellant would have us believe, the prosecutor actually informed the jury that it is not his beliefs, but the decision of the jury, which matters.

Appellant next complains about comments the prosecutor made in his closing argument during the guilt phase. First, he contends that in several instances, the prosecutor engaged in misconduct by personally vouching for the credibility of the witnesses.[12] We have reviewed these half dozen complained of statements, and none of them reveals a proclamation of personal belief on the part of the prosecutor. Rather, each was a permissible summary of different aspects of the case. Thus, as we conclude that there is no merit to Appellant's claims that the prosecutor improperly expressed his personal views to the jury, these ineffectiveness claims must fail.

■ Appellant's final claim concerning statements made during closing argument at guilt phase is that counsel was ineffective when he failed to pursue the claim that the prosecutor committed misconduct when he asked the jury to speculate on evidence outside of the record. Appellant's claim is in reference to comments made by the prosecutor concerning a "jeff cap" which had fallen off of Appellant's head at the scene of the shooting. The jeff cap was tested and it was revealed that the sweat found inside of it was secreted from an individual with type A blood; medical records, however, had established that Appellant had type O positive blood. At trial,

12. Appellant cites several statements by the prosecutor for this claim, referencing the following pages from the record: N.T. 3/04/87 at 1601, 1603–05, 1607, 1625, and 1628.

defense counsel utilized this evidence to support the claim that Appellant could not possibly have been the killer.

It is the prosecutor's remarks in response to this defense argument that Appellant finds objectionable. The prosecutor stated that

[w]e have this glitch in the case about blood types. Is there an explanation from the evidence? You bet there is. What about the size of [the] hat? You know, these jeff caps, they're supposed to fit a little tight, you know, so they don't blow off in the wind. And yet from being pushed up against the wall in the TV set area, this hat fell right off [Appellant's] head. Do you think it was a little large for him, like it belonged to someone else?

N.T. 3/04/87 at 1614. This statement was not improper. "A prosecutor is entitled to refer to the evidence, may argue any legitimate inferences from that evidence, and must be free to present his or her arguments with logical force and vigor." *Commonwealth v. Cox*, 556 Pa. 368, 728 A.2d 923, 931 (1999) (citations omitted). The statement made by the prosecutor in this matter was merely a permissible inference based upon the evidence.

 Appellant's next claim is that counsel was ineffective for failing to discover that Appellant had type O positive blood; Appellant contends that such a lapse was particularly egregious in a case where blood type was relevant. This argument is mystifying, for the defense counsel and the prosecutor stipulated at trial that Appellant had type O positive blood. N.T. 3/03/87 at 1495–97. Also, as noted *supra*, trial counsel fully exploited this evidence in arguing that Appellant could not possibly have been the shooter as his blood type did not match the blood type of the physical evidence found at the crime scene. Thus, we find that this claim has no merit.[13]

13. In a related claim, Appellant asserts that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when it failed to inform Appellant pre-trial of Appellant's own blood type. This is specious as "[t]he Commonwealth does not violate the *Brady* rule when it fails to turn over evidence readily obtainable by,

Next, Appellant contends that counsel was ineffective for failing to pursue the claim that the Commonwealth coerced Ramon Negron ("Negron") into giving false testimony against Appellant. Appellant contends that Negron had been prepared to testify in Appellant's favor, but instead gave evidence which inculpated Appellant; Appellant asserts that Negron changed his testimony only after he had been threatened by the Commonwealth.

Shortly after Raymond's murder, Negron had been arrested on charges that he had intimidated a witness to the killing. After his arrest, Negron gave a statement to a police detective in which he stated that Appellant had indeed killed Raymond. At trial, however, Negron recanted this statement and testified that Appellant had never told him anything about his involvement in the crime. A sidebar conference was immediately convened during which it was revealed the Negron had altered his testimony in favor of Appellant because he feared that if he testified against Appellant, he would be assaulted in prison. After Negron had an opportunity to consult with his attorney, the Commonwealth's direct examination of Negron resumed. At that juncture, Negron testified that Appellant had indeed told him he had killed Raymond. Negron also specifically testified that his testimony against Appellant was not motivated by any threat from anyone and was not due to the promise of some benefit other than being transferred from his current prison location. N.T. 2/27/87 at 1044–1047. As Appellant's claim regarding Negron's testimony is belied by the record, we hold that it is without merit.

█ Appellant's next claim of ineffective assistance at the guilt phase of his trial relates to the testimony proffered by Roberta Burke ("Burke"), a crime lab technician who testified for the Commonwealth. Appellant has two claims with respect to Burke's testimony. First, he claims that trial counsel should have objected both when the prosecutor posed the question as to how perspiration secreted by a person with blood type A could have come to be on the jeff cap worn by

and known to, the defendant." *Commonwealth v. Pursell,* 555 Pa. 233, 724 A.2d 293, 305 (1998).

Appellant during the murder, and when Burke answered that a person with blood type A could have worn it prior to Appellant wearing it. N.T. 3/04/87 at 1548–49. This claim must fail as there was no basis on which trial counsel could have objected. It is axiomatic that an expert may give an opinion in response to a hypothetical, provided that the set of facts assumed in the hypothetical is eventually supported by competent evidence. *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 236 (1995). Here, the hypothetical assumed the following facts: Appellant had worn the jeff cap to the scene of the murder; that the jeff cap, which is normally worn tight-fitting, had effortlessly been knocked off of Appellant's head during the murder; that perspiration found in the jeff cap had been secreted by a person with type A blood; and that Appellant had type O positive blood. These facts were all established by competent evidence. Thus, this line of questioning was not improper.

Appellant also baldly contends that trial counsel should have conducted his own investigation in order to present other evidence to rebut Burke's testimony. Appellant, however, does not present what this other evidence would have been. Such vague assertions are insufficient to establish that this claim has any merit.

Appellant next claims that trial counsel was ineffective for failing to investigate forensic evidence that would show that Raymond was killed when Appellant shot wildly during a struggle. Appellant claims that this evidence would have established that he did not have the requisite intent to kill Raymond, and thus should not have been convicted of first degree murder. Such a defense, however, would have run directly counter to Appellant's defense that he was an innocent man who had been misidentified. Where trial counsel fails to put forth inconsistent defenses, especially when one defense would undermine the other, we have held that such a decision is reasonable and cannot form the basis for an ineffectiveness claim. *Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430, 436 (1998).

■ Next, Appellant contends that trial counsel was ineffective for failing to uncover forensic evidence which would have established that Violeta's account of the shooting could not be correct. Specifically, Appellant claims that forensic evidence would have shown that he did not pick up Raymond after he fell in order to shoot him three more times as only two wounds could have possibly come from such point-blank shooting and there was no accounting for the third bullet Appellant allegedly fired into Raymond at such close range. Even assuming *arguendo* that Appellant could have presented this testimony at his trial, it is difficult to comprehend how impeaching Violeta over whether two or three shots were fired at her brother at point-blank range would have changed the jury's verdict considering the extensive testimony establishing that Appellant killed Raymond. Thus, this claim fails.

Appellant also asserts that trial counsel did not exploit a discrepancy in the testimony concerning which hand the shooter used during the killing. At trial, there was some evidence which showed that the killer wielded the weapon in his right hand during the murder, but Violeta testified that Appellant had used his left hand to shoot the gun. Appellant states that this was significant as there was evidence establishing that Appellant is strongly right-handed, and thus could not have been the left-handed killer whom Violeta saw killing her brother. Appellant contends that trial counsel should have fully explored this inconsistency with Violeta. This argument must fail since trial counsel did pursue such a line of questioning at trial when he cross-examined Violeta about which hand the killer used to hold the gun which killed her brother and revisited this issue in his closing statement as well. N.T. 2/26/87 at 821–23; N.T. 3/04/87 at 1567.

■ Appellant next claims that counsel was ineffective for failing to object to the admission of evidence relating to Appellant's drug dealings with Carrasquillo, Violeta's husband. The propriety of admission of such evidence was litigated on direct appeal. *Rollins*, 580 A.2d at 748. Appellant "cannot obtain post-conviction review of claims previously litigated on appeal by alleging ineffective assistance of prior counsel and

presenting new theories of relief to support previously litigated claims." *Commonwealth v. Beasley*, 544 Pa. 554, 678 A.2d 773, 778 (1996). Thus, this claim fails.

■■■ Next, Appellant raises the cursory argument that victim impact testimony was improperly admitted during the guilt phase of his trial. This argument is so sketchily presented that its contours are difficult to discern. Appellant apparently is reasoning that Violeta's brief comment during the guilt phase of trial that her son, who had witnessed the crime, is now afraid of toy guns, constitutes victim impact testimony. Even assuming *arguendo* that this comment constituted victim impact testimony, it was so fleeting that it cannot be said that it affected the outcome of this matter; thus, Appellant has failed to establish that he has been prejudiced.

Next, Appellant contends that trial counsel was ineffective for failing to pursue the claim that the trial court erred when it precluded certain cross-examination of Dalia, one of Violeta's sisters. He claims that trial counsel should have been allowed to cross-examine her on an inconsistent statement. Specifically, he contends that her statement at trial that she had seen defendant for "ten or fifteen minutes" on the street, N.T. 3/03/87 at 1339, was inconsistent with her pre-trial statement that she had seen the gunman's face for only one or two seconds before he turned his back on her. This argument is specious. Dalia had testified that, from her own home several houses away from Violeta's, she had observed Appellant enter Violeta's residence, depart the residence, and then return approximately five minutes later; the total time which she observed Appellant from her house was thus "ten to fifteen minutes". Yet her testimony made it very clear that her face-to-face observation of Appellant was far more limited. Once she heard the shots, Dalia testified at trial, she rushed from her home where she encountered and saw him face-to-face for approximately four seconds. N.T. 3/03/87 at 1352–53. This is perfectly consistent with her pre-trial statement that she had seen Appellant's face for only one or two seconds before Appellant turned his back on her and fled. As Dalia's pre-

trial and trial statements were not inconsistent, this claim lacks merit.

Next, Appellant contends that counsel was ineffective for failing to litigate the claim that the trial court improperly instructed the jury that it must believe Dalia's testimony and consider it as fact. This argument is specious. The portion of the transcript to which Appellant refers contains the judge's instruction pursuant to *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954) [14] and how it applied to the identification testimony of Violeta, Angel Rivera, and Lida Cintron, three witnesses who had initially failed to pick defendant's photo out of a photo array shown them by police. In giving this charge, the trial judge stated that the *Kloiber* charge was inapplicable to Dalia because she had ample opportunity to view Appellant and her identification of him had never wavered. N.T. 3/04/87 at 1649–50. The trial judge did not in any fashion instruct the jury that it must credit Dalia's testimony. Thus, this issue is meritless.

Appellant also raises several ineffectiveness claims concerning the penalty phase. His first contention is that trial counsel was ineffective because he failed to conduct an investigation which would have uncovered important information relating to Appellant's upbringing as well as physical and psychological traumas, evidence which could have been used at the penalty phase of trial to establish that Appellant had severe mental problems. This claim must fail. We have stated that we will not find that counsel was ineffective in failing to produce mitigating evidence relative to an alleged mental infirmity where there is no indication that counsel had any reason to know that the defendant might have a mental problem. *See Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 238 (1998); *Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334 (1998). As Appellant has failed to allege, let

14. A *Kloiber* charge instructs the jury that a eyewitness' identification should be viewed with caution where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past. *Kloiber*, 106 A.2d at 826–27.

alone prove, that trial counsel was aware of Appellant's alleged mental condition, we deny him relief on this issue.

■ Appellant's next series of ineffectiveness claims relate to allegedly inappropriate statements made by the Commonwealth during the penalty phase. As stated *supra*, these ineffectiveness claims will be deemed to have merit only where Appellant can establish that "the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict." *Travaglia*, 661 A.2d at 360–61 (citations omitted). Furthermore, "[a]t the penalty phase, where the presumption of innocence is no longer applicable, the prosecutor is permitted even greater latitude in presenting argument." *Id.* at 365.

■ Appellant first complains that the prosecutor exhorted the jury to "kill the enemy" and sentence Appellant to death. This is a gross misstatement of the record. The prosecutor's actual statement was that

> Service on a capital case is one of the greatest and heaviest responsibilities of citizenship. I would like you to compare it to something else. There are men old enough to have served in the [W]orld [W]ar, in Korea and in Vietnam. It is an obligation of citizenship when the country is at war to serve in the armed forces and, if called upon, to take human life of the enemy. It is with a heavy heart that men and women who go to war do that.

N.T. 3/05/87 at 1831. The prosecutor was not, as Appellant characterizes this statement, exhorting the jury to sentence Appellant automatically to death as a soldier would be compelled to kill the enemy in wartime. Rather, he was likening sitting on a penalty phase jury in a capital case—surely one of the more weighty responsibilities a citizen could have in this society—to the burden placed on citizen-soldiers in war. We find this to be mere oratorical flair and not improper. Thus, this ineffectiveness claim has no merit.

■ Next, Appellant claims that the prosecutor improperly asked the jury to sentence Appellant to death so as to deter other potential murderers. We have previously rejected a similar claim. In *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 958 (1982), we stated that such fleeting references to the deterrent effect of the death penalty did not bias or prejudice the jury as they are "a matter of common public knowledge based on ordinary human experience." We therefore find there is no merit to this claim.

Appellant next claims that his counsel was ineffective for failing to pursue the claim that the prosecutor impermissibly offered his personal opinion that the evidence was sufficient to establish the aggravating factor that the killing posed a grave risk of harm to others. This argument is specious. The prosecutor merely cataloged the extensive evidence in support of this aggravating circumstance; furthermore, he again reminded the jury that "you are the finder of fact." N.T. 3/05/87 at 1841. Thus this claim has no merit.

■ Appellant next argues that the prosecutor improperly commented on Appellant's lack of remorse. At penalty phase, Appellant took the stand. In referencing Appellant's testimony in his closing, the prosecutor briefly argued to the jury that Appellant expressed only one emotion on the witness stand and that was anger toward Violeta, the sister of the victim, and did not express remorse for the murder. N.T., 3/05/87 at 1842–43. We have stated that such brief comments regarding a defendant's remorse—particularly when it is in response to a defendant's self-centered display of emotion—do not constitute misconduct. *Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 784 (1998); *Commonwealth v. Harris*, 550 Pa. 92, 703 A.2d 441, 451 (1998). Thus, we find that this claim has no merit. Furthermore, even if we assume *arguendo* that this claim does have merit, the impact of this isolated comment was minimal and it cannot be said, given the evidence presented at the penalty phase of this trial, that the result would have been different had trial counsel objected to this comment and had that objection sustained. Thus, as Appel-

lant has failed to show that he has been prejudiced by this comment, this ineffectiveness claim must fail.

Next, Appellant claims that the prosecutor inappropriately informed the jury that the fact that drugs were involved in this matter constituted an additional, independent aggravating factor. Appellant grossly mischaracterizes the record. The prosecutor clearly informed the jury that the underlying felony to support the aggravating factor that the murder occurred during the commission of a felony was robbery; he did not posit to the jury that the mere presence of drugs would be another aggravating factor. N.T. 3/05/87 at 1847.

Appellant's next claim is that the prosecutor improperly disparaged his mitigating evidence concerning the fact that he provided support for two of his four children; Appellant claims that the prosecutor's statements were tantamount to instructing the jury to disregard this evidence. Appellant's claim has no merit. It is true that the prosecutor disparaged the evidence which Appellant proffered, implying that it was of so little weight that it should not affect the verdict. That, however, is a permissible argument. *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861, 869 (1990) (a prosecutor may argue to the jury that it should not attach any substantial weight to mitigating circumstances presented by the defense). We conclude that this claim has no merit.

Appellant's final ineffectiveness claim concerning comments made by the prosecutor during the penalty phase is that the prosecutor stated to the jury that they would have to sentence Appellant to death in order to live up to the oaths they took at the outset of the trial. This argument is specious. The prosecutor actually stated that he was asking the jury "to live up to your promise under oath that you follow the law that you'll get from [the trial court judge]." N.T. 3/05/87 at 1849. As the prosecutor did not act improperly in making this comment, there is no merit to Appellant's claim that counsel was ineffective for failing to pursue this claim.

Appellant also raises several ineffectiveness claims relating to the instructions given to the jury at penalty phase. First,

he contends that counsel was ineffective when he failed to pursue the claim that the trial court's instructions to the jury precluded the jury from considering relevant mitigating evidence. The trial judge did not so fetter the jury in its inquiry; in fact, the trial judge specifically stressed that the jury was to consider "[a]ll the evidence from both sides, including the evidence you heard earlier during the trial in chief as to aggravating or mitigating circumstances. . . ." N.T. 3/05/87 at 1854. Thus, this claim is without merit.

 Appellant next claims that counsel was ineffective for failing to raise the issue that the jury instructions and the verdict slip indicated that the jury had to find unanimously any mitigating factor before it could give effect to that factor in its sentencing decision, thus violating the dictates of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). We find this claim to be meritless. The trial judge's charge to the jury virtually mirrored 42 Pa.C.S. § 9711(c)(1)(iv). N.T. 3/05/87 at 1855. We have previously stated that where a charge tracks this statutory language, it "does not state or infer a requirement that any given mitigating circumstance must be unanimously recognized before it can be weighed against aggravating circumstances in reaching a verdict." *Travaglia,* 661 A.2d at 366. Likewise, the verdict form closely tracked the language of the statute. In reviewing a similar verdict slip, this court in *Commonwealth v. Hackett,* 534 Pa. 210, 627 A.2d 719 (1993) held that the verdict slip form did not infer a need for unanimity with regard to mitigating circumstances. We therefore reject this claim.[15]

 Appellant's final contention concerning the instructions to the jury during penalty phase is that counsel was ineffective for failing to pursue the claim that the trial court erred when it did not instruct the jury that a life sentence

---

**15.** Appellant contends that the decision of the Court of Appeals for the Third Circuit in *Frey v. Fulcomer,* 132 F.3d 916 (3d Cir.1997) militates a different result as the *Fulcomer* court found a virtually identical charge to be improper. We have recently rejected the claim that we must follow *Fulcomer* as decisions from intermediate federal courts are not binding on this court. *Commonwealth v. Chester,* 733 A.2d 1242, 1248 (Pa.1999) (refusing to adopt the Third Circuit's rationale in *Fulcomer* ).

means that Appellant must spend his natural life in prison without the possibility of parole. This "life means life" instruction was made compulsory by the United States Supreme Court in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). We have stated, however, that *"Simmons* will not be given retroactive effect in a collateral attack upon a petitioner's sentence." *Commonwealth v. Laird,* 555 Pa. 629, 726 A.2d 346, 360 (1999). In PCRA petitions such as the one in the matter *sub judice,* the rule to be applied is the one which was applicable at the time of trial. At the time of Appellant's trial, the law of this Commonwealth specifically prohibited an instruction which would inform a jury that life means life without parole. *Commonwealth v. Edwards,* 521 Pa. 134, 555 A.2d 818, 830–831 (1989). Thus, as the controlling law at the time would not allow a "life means life" instruction, the trial court did not err in failing to give *sua sponte* this instruction. Furthermore, we will not deem counsel ineffective for failing to anticipate a change in the law. *Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 900 (1999).

■ Next, Appellant contends that counsel was ineffective for failing to raise the claim that his death sentence should be vacated because one of the aggravating factors on which his sentence was based—namely that the murder was perpetrated during the course of a felony—is irrational, arbitrary and capricious. Specifically, Appellant contends that this aggravating factor would allow a jury to sentence a defendant to death where the killing was the result of a mistake, such as where a killing occurs accidentally in a "robbery gone awry" (which Appellant contends that the jury in this matter found) as opposed to "a planned murder...." Appellant's brief at 90. This argument is absurd. The only time a penalty phase is convened is when a defendant stands convicted of first degree murder. With all of those defendants, it has been established beyond a reasonable doubt that the killings were committed with specific intent. *See* 18 Pa.C.S. § 2502(a) (to find a defendant guilty of murder, the jury must find that the

defendant had specific intent to kill).[16] Thus, it would be impossible for a jury to find arbitrarily the aggravating factor of 42 Pa.C.S. § 9711(d)(6) with regard to a defendant who lacked the specific intent to kill as such a defendant would never be the subject of a penalty hearing. *Commonwealth v. Bardo,* 551 Pa. 140, 709 A.2d 871, 878 (1998) (rejecting claim that 42 Pa.C.S. § 9711(d)(6) would allow a jury to find this aggravating factor in the absence of a finding that the defendant had specific intent to commit the murder). We thus reject this ineffectiveness claim.

Next, Appellant claims that one of the jurors erroneously informed the other members of the jury that Appellant would be available for parole after only thirteen years imprisonment if the jury sentenced him to life.[17] Appellant claims that this information tainted the jury's deliberations, and that counsel was ineffective for failing to pursue this issue on appeal.[18] This claim must be rejected. "The general rule of law is that a juror may not impeach his or her own verdict after the jury has been discharged. An exception to this rule is made for those situations where a jury has been exposed to an *ex parte* influence, which possesses a reasonable likelihood of prejudice." *Laird,* 726 A.2d at 356 (citations omitted). In this instance, there was no *ex parte* influence brought to bear on the jury; thus, the limited exception would have no application. As this claim has no merit, counsel was not ineffective for failing to pursue it.

Next, Appellant complains that counsel was ineffective for failing to raise the claim that this court's proportionality review, conducted pursuant to 42 Pa.C.S. § 9711(h)(3)(iii) [19], is

16. We note that Appellant's claim that the jury found that he was guilty of something less than an intentional killing is spurious in light of their verdict at guilt phase.

17. Appellant supports this claim with purported affidavits obtained by his PCRA counsel from two jurors.

18. In analyzing this claim, we will assume, *arguendo,* that counsel would have been able to discover this information prior to taking the appeal in this matter.

19. Recently enacted legislation struck the statutory provisions requiring this court to conduct a proportionality review of death sentences. Act

inherently flawed. We recently reviewed this same claim in *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (1997). We noted that in conducting our proportionality review,

> we examine not only the compiled data from the AOPC, but we also have at our disposal the verdict sheets and the review forms submitted by the President Judges. This allows us to conduct a thorough review of cases similar to the one in question and provides additional screening for any anomalies that may be present in the AOPC database. We have carefully reviewed these procedures and find nothing arbitrary or capricious in this scheme. Instead, we believe that our proportionality review comports with the General Assembly's desire to afford capital defendants an additional check against the arbitrary imposition of the death penalty.

*Id.* at 441. As Appellant presents no reason for us to abandon our holding in *Gribble*, we find no basis on which to find that counsel was ineffective for failing to raise this claim.

Finally, Appellant claims that the cumulative effect of the errors made his trial fundamentally unfair. We disagree. We have determined that none of Appellant's claims entitles him to relief and it is axiomatic that "no quantity of meritless issues can aggregate to form a denial of due process." *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 367 (1995).

For the foregoing reasons, we affirm the order of the PCRA court.[20]

of June 25, 1997, No. 28, S 1 ("Act 28"), effective immediately. This court continues to undertake a proportionality review in cases where the death sentence was imposed prior to the effective date of Act 28. *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (1997).

**20.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor.