J-S72045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JASON SMITH | : | |
| | : | No. 2994 EDA 2015 |
| Appellant | | |

Appeal from the Judgment of Sentence May 13, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0004803-2013

BEFORE:   BENDER, P.J.E., MUSMANNO, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                **FILED DECEMBER 27, 2017**

Appellant Jason Smith appeals from the judgment of sentence entered by the Court of Common Pleas of Philadelphia County after a jury convicted Appellant of first-degree murder, arson, risking catastrophe, abuse of corpse, and possession of an instrument of crime (PIC).  We affirm.

Appellant was charged with the aforementioned offenses in connection with the January 21, 2013 murder of Melissa Ketunuti ("the victim").  On that day, the victim, a physician and researcher at the Children's Hospital of Philadelphia, had taken the day off to address a rodent problem in her home by meeting with Appellant, who was employed by an exterminator.  When Appellant arrived at the victim's three-story row home on Naudain Street in center city Philadelphia, he accompanied her to the basement to perform

_____
* Former Justice specially assigned to the Superior Court.

extermination services. During this house call, Appellant strangled the victim to death and set fire to her body.

Video surveillance cameras in the neighborhood captured evidence of Appellant entering and leaving the victim's home on the day of her murder. The footage shows Appellant initially parking his truck two blocks from the victim's home at 10:44 a.m. Thereafter, Appellant sat in his truck until 10:50 a.m., when the victim walked past his truck on her way back home from the local pharmacy. Just twenty-four seconds after the victim passed Appellant's truck, Appellant exited the vehicle and began following the victim to her home.

Appellant entered the victim's home at her invitation. At 11:42 a.m., Appellant left the victim's home at a quick pace, carrying a tool box, and was no longer wearing the jacket and hat he was wearing when he arrived. In addition, the videos show that Appellant drove past the victim's house twice after leaving the residence, even though her house was located on a narrow street that did not lead to any major roads.

At 12:15 p.m., just thirty-three minutes after Appellant left the victim's home, Andrew Bredensteiner arrived at the victim's home to walk her dogs. Bredensteiner found it peculiar that the front door was unlocked. When he entered the residence, he heard a beeping sound and saw thick smoke. As Bredenstein became concerned that the victim was in danger, he searched the residence and found the victim's body on fire in the basement.

After Bredensteiner called 9-1-1, firefighters arrived and extinguished a small fire. They observed the victim's neck compressed by a cinched belt, her

hands and feet bound with equestrian equipment, and her face burned beyond recognition. The firefighters found burned paper and a burned cardboard box by the victim's body. Medical examiners performed an autopsy of the victim's body and opined that the cause of her death was strangulation and the manner of death was homicide as the victim suffered soft tissue damage and hemorrhages in her neck. Although the victim's body was badly burned, there was no evidence of carbon monoxide in her blood or soot in her airways.

Law enforcement suspected that Appellant was involved in the victim's murder and obtained a warrant to search Appellant's home and truck. After the officers had entered the home, Appellant blurted out "she was alive when I left her"; the detectives did not say anything to Appellant before or after he made this statement. Officers discovered documentation indicating that Appellant had been scheduled to visit the victim's home on the morning of the murder to address a rodent problem. However, Appellant did not have any documentation that the victim had paid him or that he had completed the extermination service.

Detectives brought Appellant to the Homicide Unit and gave Appellant his *Miranda* rights. When the detectives began to question Appellant about his reason for being at the victim's home on the day of her murder, Appellant again claimed that the victim was alive when he left her house. Appellant acknowledged seeing the extensive media coverage of the victim's murder and admitted that he did not contact the police or tell anyone that he had been at the victim's home shortly before she was murdered. Detectives

informed Appellant that they had recovered video surveillance footage of his presence at the crime scene near the time of the victim's death and showed him crime scene photographs.

Shortly thereafter, Appellant admitted he had murdered the victim. According to Appellant, he was aggravated as the victim had canceled a prior appointment after he had already arrived at her home, the victim's dog kept bothering Appellant while he was trying to work, and the victim criticized Appellant's work. Appellant alleged that he refused the victim's request to fill in numerous holes in the basement wall where mice could enter as he felt that idea was not feasible. Appellant claims that the victim told him that he should not be an exterminator as he did not know what he was doing.

Appellant grabbed the victim's neck and choked her, even though she begged him to stop. When the lifeless victim fell to the floor, Appellant tied her body up and set it on fire in an attempt to destroy evidence of his involvement in her death. Appellant revealed that he ignited the fire by putting a paper towel on the stove and throwing it into a cardboard box; these specific items were not visible in the crime scene photos but were later recovered by the detectives. Moreover, Appellant explained that he drove past the victim's house again as he considered returning to put the fire out. Appellant's account of the murder and his assertion that he did not sexually assault the victim was consistent with the victim's autopsy results.

After Appellant was charged with the victim's death, he was placed in custody while he awaited trial. During recorded phone conversations from

prison, Appellant joked with his girlfriend about pretending to be intellectually impaired so that the jury would question the validity of his confession to police.

At the conclusion of Appellant's trial on May 15, 2015, the jury convicted Appellant on all charges. On the same day, the trial court imposed the mandatory minimum sentence of life imprisonment for first-degree murder along with consecutive sentences of 10 to 20 years for arson, 3½ to 7 years for risking a catastrophe, 1 to 2 years for abusing a corpse, and 2½ to 5 years for possession of an instrument of crime. This appeal followed.

Appellant raises three issues for our review on appeal:

A. Did the trial court err when it denied Appellant's request for a hearing pursuant to [*Franks v. Delaware*, 438 U.S. 154 (1978)]?

B. Did the trial court err by overruling a motion for mistrial regarding testimony given by Assistant Fire Marshall Werez in response to a hypothetical question?

C. Did the trial court err by overruling a motion in limine to preclude the Commonwealth from cross-examining Appellant with the contents of the prison recordings?

Appellant's Brief, at 4.

Appellant's first argument on appeal challenges the trial court's decision to deny his suppression motion challenging the validity of the warrant issued for the search of his home and truck. Our standard of review is as follows:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Woodard*, 634 Pa. 162, 129 A.3d 480, 498 (2015). We are bound by the suppression court's factual findings

- 5 -

so long as they are supported by the record; our standard of review on questions of law is *de novo*. ***Commonwealth v. Galvin***, 603 Pa. 625, 985 A.2d 783, 795 (2009). Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. ***Commonwealth v. Poplawski***, 634 Pa. 517, 130 A.3d 697, 711 (2015). Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial. ***In the Interest of L.J***., 622 Pa. 126, 79 A.3d 1073, 1085 (2013).

***Commonwealth v. Singleton***, 169 A.3d 79, 82 (Pa.Super. 2017) (quoting

***Commonwealth v. Yandamuri***, ___Pa.___, 159 A.3d 503, 516 (2017)).

With regard to search warrants, we have explained the following.

It is well-established that for a search warrant to be constitutionally valid, the issuing authority must decide that probable cause exists at the time of its issuance, and make this determination on facts described within the four corners of the supporting affidavit, and closely related in time to the date of issuance of the warrant. It is equally well established that a reviewing court must pay great deference to an issuing authority's determination of probable cause for the issuance of a search warrant. Moreover, our Supreme Court has recognized that affidavits supporting search warrants normally are prepared, by nonlawyers in the midst and haste of a criminal investigation, and, accordingly, said affidavits, should be interpreted in a common sense and realistic fashion rather than in a hypertechnical manner.

***Commonwealth v. Korn***, 139 A.3d 249, 253 (Pa.Super. 2016) (quoting

***Commonwealth v. Griffin***, 24 A.3d 1037, 1043 (Pa.Super. 2011)) (brackets

and quotation marks omitted). "[P]robable cause exists when, based upon a

totality of the circumstances set forth in the affidavit of probable cause, there

is a fair probability that evidence of a crime will be found in a particular place."

***Korn***, 139 A.3d at 254 (quoting ***Commonwealth v. Lyons***, 622 Pa. 91, 110,

79 A.3d 1053, 1064 (2013)).

Appellant claims that the trial court erred in denying his request for a hearing to review his challenge to the validity of the search warrant as the affidavit of probable cause allegedly contained material misrepresentations. Appellant solely relied on the decision in **Franks**, in which the United States Supreme Court held that if a defendant makes a substantial preliminary showing that the affiant deliberately or with reckless disregard included a false statement in the search warrant application, the defendant is entitled to a hearing on these allegations pursuant to the Fourth Amendment. **Franks**, 438 U.S. at 171.

The High Court also clarified that to warrant a hearing, the false statement must be material, that is, necessary to establish probable cause. **Id**. at 171-72 (if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required). Our Supreme Court has also held that the defendant has "the burden of establishing, at least *prima facie,* a material misrepresentation in the warrant's affidavit before inquiry would be constitutionally required by the Fourth Amendment." **Commonwealth v. Miller**, 513 Pa. 118, 130, 518 A.2d 1187, 1193 (1986).

Appellant argues that the affidavit of probable cause contained four misstatements in alleging that (1) Appellant brought a "plumber's torch" to the victim's home on the day of the murder, (2) Appellant followed the victim home on the morning of the murder, (3) the surveillance camera footage

showed the entirety of the victim's block, and (4) there were no other people on the street after Appellant left. Appellant's Brief, at 14.

Appellant's claim fails for two reasons. First, while Appellant alleges that some of the information in the affidavit may not have been technically correct, he does not allege or show that the affiant deliberately or with reckless disregard included a false statement in the affidavit. Although some details in the affidavit may have been included hastily during this active criminal investigation, the **Franks** Court recognized that its requirement of a truthful basis for the issuance of a warrant "does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." **Franks**, 438 U.S. at 165.

Moreover, Appellant failed to show how any of the alleged misstatements were material as there is sufficient content in the affidavit to establish probable cause without these allegations. After the investigating officers noted there was no signs of forced entry into the victim's home, they concluded that the murderer must have been someone familiar to the victim. The officers suspected that Appellant was responsible for the victim's murder after they obtained the victim's phone records showing she had prior phone contact with Appellant and observed the video footage showing Appellant's presence at the victim's home just prior to her death. The surveillance video showed that Appellant was inside the victim's home for forty-five minutes and

hurriedly left her home just thirty-three minutes before her body was discovered. In addition, the cameras captured Appellant driving past the victim's home twice for no apparent legitimate reason.

As a result, we conclude that the trial court did not err in denying this claim without a hearing as Appellant failed to meet his burden in making a substantial preliminary showing that the warrant application contained a material false statement that was made by the affiant deliberately or with recklessness of the truth.

Second, Appellant challenges the trial court's decision to allow one of the Commonwealth's expert witnesses to testify in response to a hypothetical question posed by the prosecution. Appellant points to the trial court's decision to overrule his objection to the testimony of Assistant Fire Marshall, Lieutenant George Wentz, who opined that it likely would have taken approximately twenty to twenty-five minutes for a small fire in the basement of the victim's home to fill the upper floors of her home and the victim's neighbor's row home with smoke.[1]

It is well-established that "evidentiary rulings are within the general province of the trial courts and will not be overturned by an appellate court

_____

[1] We note that although another Assistant Fire Marshall, Lieutenant Malcolm Clay prepared an expert report regarding the origin and cause of the fire at the victim's home, he was unavailable to testify at Appellant's trial. The trial court accepted Lieutenant Wentz as an expert witness as he had conducted investigations on approximately 800 fires. In testifying, Lieutenant Wentz referenced the factual information set forth in Lieutenant Clay's report. Appellant does not challenge the trial court's decision to qualify Lieutenant Wentz as an expert witness.

absent an abuse of discretion, as, for example, when the law is overridden or misapplied. ***Commonwealth v. Maconeghy***, ___Pa.___, 171 A.3d 707, 712 (2017) (citing ***Commonwealth v. Flor***, 606 Pa. 384, 414, 998 A.2d 606, 623 (2010)).

As a general rule, "expert testimony is admissible, in all cases, civil and criminal alike, when it involves explanations and inferences not within the range of ordinary training[,] knowledge, intelligence and experience." ***Commonwealth v. Walker***, 625 Pa. 450, 486, 92 A.3d 766, 788 (2014). The admissibility of expert testimony is governed generally by Rule 702 of the Pennsylvania Rules of Evidence, which provides:

> **Rule 702. Testimony by Expert Witnesses.**
> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

In addition, our rules of evidence provide that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Pa.R.E. 703. Despite Appellant's suggestion to the contrary, our courts have established that an expert may respond to a

hypothetical with an opinion so long as the operative set of facts is eventually supported by competent evidence." ***Commonwealth v. Montalvo***, 604 Pa. 386, 405, 986 A.2d 84, 95 (2009) (citing ***Commonwealth v. Rollins***, 558 Pa. 532, 738 A.2d 435, 446 (1999) (citing ***Commonwealth v. LaCava***, 542 Pa. 160, 666 A.2d 221, 236 (1995))).

In this case, the record establishes that the prosecutor's line of hypothetical questions to Lieutenant Wentz was based on competent evidence presented at trial, showing that, after Appellant set fire to the victim's body in the basement, smoke filled the victim's home, moved to the neighbor's home, and set off the neighbor's smoke alarm. Thus, it was permissible for Lieutenant Wentz to offer an expert opinion on the approximate time frame necessary for these events to occur. Accordingly, we conclude that the trial court did not abuse its discretion in overruling Appellant's objection to this expert testimony.

Lastly, Appellant argues that the trial court erred in denying his motion in limine in which he sought to preclude the Commonwealth from cross-examining him with the contents of his prison recordings. However, while the prosecution introduced Appellant's statements by playing the actual audio recording of his conversation, Appellant did not ensure that this conversation was transcribed for the record on appeal. Our review on appeal is limited to the facts that have been duly certified in the record. ***Commonwealth v. Kennedy***, 151 A.3d 1117, 1127 (Pa.Super. 2016). Further, "it is Appellant's responsibility to ensure that this Court has the complete record necessary to

properly review a claim." **Id**. Accordingly, we must find this issue waived as we cannot assess the prejudicial effect of the recording and cannot evaluate the trial court's discretion in allowing the recording to be played for the jury.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/27/2017*