**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-9002
_____

DANIEL M. SARANCHAK,
                                        Appellant
v.

SECRETARY, PENNSYLVANIA DEPARTMENT OF
CORRECTIONS;
DAVID DIGUGLIELMO, Superintendent of the
State Correctional Institution of Graterford;
FRANK TENNIS, Superintendent of the
State Correctional Institution at Rockview;
ATTORNEY GENERAL OF PENNSYLVANIA;
SCHUYLKILL COUNTY DISTRICT ATTORNEY
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 1-05-cv-00317
District Judge: The Honorable Sylvia H. Rambo

Argued July 16, 2015

Before: SMITH, VANASKIE, and ROTH, *Circuit Judges*

(Opinion Filed: September 14, 2015)

Matthew C. Lawry
Stuart B. Lev                    [ARGUED]
Shawn Nolan
Federal Community Defender Office for
  the Eastern District of Pennsylvania
Trial Unit
601 Walnut Street
The Curtis Center
Suite 540 West
Philadelphia, PA  19106

      *Counsel for Appellant*

James P. Barker
Jennifer A. Peterson         [ARGUED]
Office of Attorney General of Pennsylvania
Appeals & Legal Services
Strawberry Square
16th Floor
Harrisburg, PA  17120

      *Counsel for Appellee*

———————————

OPINION

———————————


SMITH, *Circuit Judge.*

This is the second appeal from District Court action on Daniel Saranchak's petition for writ of habeas corpus following his conviction on first degree murder charges of killing both his grandmother, Stella Saranchok,[1] and his uncle, Edmund Saranchak. The first issue Saranchak raises in this appeal is whether the District Court erred when it rejected Saranchak's claim that the degree-of-guilt phase of his trial in the Court of Common Pleas of Schuylkill County, Pennsylvania was suffused with prejudice from the cumulative errors arising out of his counsel's performance at trial. Second, Saranchak appeals from the denial of his claim that his attorney was constitutionally ineffective at the penalty phase of his trial. For the reasons we explain below, we will affirm the District Court's denial of Saranchak's claims pertaining to trial counsel's conduct at the degree-of-guilt phase. We will reverse, however, the District Court's judgment as to penalty and vacate Saranchak's sentence of death. If the Commonwealth still seeks the death penalty for Saranchak, the Commonwealth must conduct a new sentencing hearing.

---

[1] As we noted in our first opinion, Saranchak's grandmother spelled her surname differently from her grandson.

**I.**

Because this is the second time we have reviewed Saranchak's degree-of-guilt hearing, we will assume familiarity with our opinion in *Saranchak v. Beard* (*Saranchak I*), 616 F.3d 292 (3d Cir. 2010), and recount only that factual and procedural background necessary to this appeal. This case comes to us following Saranchak's open plea of guilty to murdering his grandmother and uncle, his conviction on two counts of first-degree murder following a nonjury degree-of-guilt hearing conducted pursuant to Pa. R. Crim. P. 803(A), and a jury's subsequent determination that Saranchak should be sentenced to death for his crimes. The Pennsylvania Supreme Court affirmed Saranchak's conviction and sentence on direct appeal. Saranchak then sought state postconviction relief pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541–9546, asserting that his attorney at trial, Kent Watkins, had been constitutionally ineffective. The PCRA court—the same judge who presided over both phases of Saranchak's trial—held an evidentiary hearing but denied relief. *Commonwealth v. Saranchak* (*Saranchak-PCRA*), No. 889, 889A-1993 (Pa. Ct. Com. Pl. July 8, 2003). The Pennsylvania Supreme Court ultimately[2] affirmed the denial of Saranchak's PCRA claims. *Commonwealth v. Saranchak* (*Saranchak-Pa.*), 866 A.2d 292 (Pa. 2005).

---

[2] For reasons not relevant to this appeal, the Pennsylvania Supreme Court initially vacated the denial of Saranchak's PCRA petition so that Saranchak could file an amended petition. After the PCRA court denied the amended PCRA petition, the Pennsylvania Supreme Court affirmed.

Saranchak then petitioned for habeas corpus in the District Court, again arguing that his trial counsel's ineffectiveness had deprived him of a fair trial. The District Court granted habeas relief on the grounds that trial counsel had unreasonably "fail[ed] to investigate, discover, and present evidence to support a diminished capacity defense," and had unreasonably failed to litigate suppression issues related to Saranchak's confessions both to law enforcement following his arrest as well as to a Schuylkill County Children and Youth Services ("CYS") caseworker. *Saranchak v. Beard*, 538 F. Supp. 2d 847, 891 (M.D. Pa. 2008). The District Court left unresolved several alternative grounds for relief, including counsel's ineffectiveness during the penalty phase of Saranchak's trial. The Commonwealth appealed, and we reversed the District Court's judgment. *Saranchak I*, 616 F.3d at 314. We also remanded the case for consideration of Saranchak's remaining claims.

On remand, considering all of Saranchak's remaining arguments, the District Court denied relief. Pursuant to 28 U.S.C. § 2253(c)(2), Federal Rule of Appellate Procedure 22(b), and Third Circuit Local Appellate Rule 22.2, the District Court granted a certificate of appealability ("COA") regarding "whether the court properly resolved the issues of whether Saranchak was denied effective assistance of counsel at his capital sentencing." *Saranchak v. Beard* (*Saranchak II*), Civil No. 1:05-CV-0317, 2012 WL 1414344, at *35 (M.D. Pa. Apr. 24, 2012).[3] We also granted in part

_____

[3] The District Court also granted a COA as to its resolution of Saranchak's claim regarding "whether the trial court failed to instruct the jury on the mitigating circumstance of extreme

5

Saranchak's motion to expand the COA to include "whether, at the penalty phase, the trial court unconstitutionally deprived [Saranchak] of the use of a mental health expert and whether counsel was ineffective for failing to secure the appointment of such an expert" under *Ake v. Oklahoma*, 470 U.S. 68 (1985), as well as "whether the cumulative prejudicial effect of any errors in this case undermines confidence in the outcome of the trial." App. 53–54.

Regarding the degree-of-guilt hearing, Saranchak focuses on the cumulative impact of three alleged errors by trial counsel. According to Saranchak, these errors collectively undermine the trial court's finding of premeditated intent in the commission of the murders. First, Saranchak argues that his trial counsel failed to move to suppress Saranchak's confession to Pennsylvania State Police officers made after his arrest. In that confession, Saranchak admitted to killing his uncle. As we explained in *Saranchak I*, testimony during Saranchak's degree-of-guilt hearing revealed that during his interrogation

> Saranchak [had] acted as if the officers questioning him were drill sergeants, responding to their questions with formal 'Yes, Sir' or 'No, Sir' answers. He soon admitted that he had been present at Stella's house, but then rebuffed the officers' follow-up questions

mental or emotional disturbance and counsel's failure to object." *Saranchak II*, 2012 WL 1414344, at *35. In his opening brief in this court, Saranchak abandoned this claim, so we need not consider it further. Appellant's Br., at 5 n.1.

by explaining that he was part of a classified military mission. After further questioning, he characterized the scene at Stella's house as 'not a pretty sight.' Saranchak eventually admitted to the state trooper interrogating him that he had shot Edmund.

*Saranchak I*, 616 F.3d at 298. But Saranchak did not confess to killing his grandmother, instead "maintaining firmly that such information was classified." *Id.* We noted that "the State Police probably did violate Saranchak's *Miranda* rights" when they continued to question Saranchak, despite his "probably sufficient" invocation of his right to remain silent through his "assertions that the information was classified." *Id.* at 306.

But this was not Saranchak's only confession. Saranchak also separately described the killings, including his motive, to Laurie Garber, a Children and Youth Services caseworker with whom Saranchak met to discuss his three children while he was awaiting trial. Garber testified that Saranchak "admitted to killing his uncle" and that Saranchak "had killed him because of years of being talked about and greed." App. 190. Indeed, Saranchak complained that his uncle's children had received an inheritance upon his grandfather's passing, yet Saranchak and his siblings inherited nothing. Further, Saranchak told Garber that his grandmother had been "very sick with cancer," from which Garber received the impression that Saranchak believed "he was doing [his grandmother] a favor because she was so sick." App. 192. Garber also reported that Saranchak had claimed he was not intoxicated on the night of the killings,

7

yet he had nevertheless "snapped." App. 190. But Saranchak denied robbing his uncle and his grandmother. Although Saranchak had previously challenged the admission of this confession to Garber as violating his Fifth Amendment rights, we concluded that Saranchak's responses to Garber's questions did not implicate his privilege against self-incrimination because their conversation did not amount to an interrogation. *Saranchak I*, 616 F.3d at 305.

In his second claim of error, Saranchak contends that trial counsel was ineffective in failing to seek suppression of testimony from a cooperating witness, Roy Miles. Miles, testifying pursuant to a plea agreement, was the only eyewitness to the killings and testified in depth as to Saranchak's behavior that evening. According to Miles, he and Saranchak were drinking at a bar on the night of the murders when their conversation turned to where they might get some money. Saranchak volunteered that he knew of a source, but they "might have to shoot someone." App. 162.[4]

---

[4] Miles would later recant this statement, admitting that he and Saranchak had never planned to steal any money from Saranchak's grandmother. During the PCRA hearing, Miles claimed that he could not remember telling police that Saranchak had stated they "may have to shoot somebody." App. 840. Nevertheless, according to Miles "they told [him] that [he] had to testify against Mr. Saranchak at his trial" and that "this is what [he] had to say when [he] was asked . . . this question." App. 840–41. Miles's testimony was not clear as to who instructed him to testify in this fashion. On cross examination at the PCRA hearing, Miles suggested that the

8

Miles then accompanied Saranchak to Saranchak's stepfather's home, where Saranchak met his girlfriend and obtained a rifle. Miles and Saranchak then went to another bar, where Saranchak commented that he "wanted to load the trash up in the truck to do a crime" in Virginia and "[t]hat way it [would] look[] like we were there for a purpose." App. 163. Rather than driving to Virginia, however, Saranchak took Miles to his grandmother's home.

Miles then testified that upon their arrival, Saranchak declared that he was "going in to get some money off [his] grandmother." App. 164. Miles followed Saranchak into the home, where they found Saranchak's uncle asleep on the couch. Without saying a word, Saranchak shot his sleeping uncle in the head immediately upon entering. When a dog entered the room, Saranchak reassured Miles that "[t]he dog used to be [Saranchak's] dog and he wasn't going to bark." App. 164. Saranchak then ascended the stairs to his grandmother's bedroom and attempted to hand Miles the rifle. Miles refused. After Saranchak's grandmother called out to her grandson, Saranchak shot her in the head as well.[5] Miles

prosecutor as well as his own attorney gave him this "impression." App. 846.

[5] Law enforcement testified at trial that both Edmund Saranchak and Stella Saranchok had been shot in "the center of [the] forehead." App. 124–25. But the autopsy revealed that the bullet had entered Saranchak's uncle "through the left upper eyelid." App. 1122. The police report of the initial investigation also indicated that Saranchak's grandmother's gunshot wound was located on the "right eyebrow." App. 1119–20.

also claimed that Saranchak took his uncle's wallet before both he and Saranchak returned to a bar. *See also Saranchak I*, 616 F.3d at 297–98 (discussing additional details regarding the killings).

During his testimony, Miles revealed that he was in possession of a fair amount of money on the night of the murders—at least "two fifties and some twenties." App. 183. In response to the Commonwealth's questioning, Miles testified that the money had been in his possession even before he met Saranchak that night, and that it had not come from Saranchak's grandmother's home. When Saranchak's trial counsel sought to inquire further as to the money's source on cross-examination, Miles invoked his Fifth Amendment right against self-incrimination. Later, at the PCRA hearing, Miles admitted that the money had come from an unrelated robbery. Saranchak now argues that the admission of Miles's testimony without additional cross examination violated Saranchak's Sixth Amendment Confrontation Clause right and that trial counsel should have raised that argument. However, we denied Saranchak's motion to expand the COA to include this theory of ineffectiveness.

Saranchak's third and final claim of error as to the degree-of-guilt phase focuses on trial counsel's failure to investigate and introduce evidence of Saranchak's mental health and family history to rebut a finding of intent. This evidence also forms the basis for Saranchak's penalty phase claims, given that it is relevant not only to Saranchak's intent but also to his character and personal circumstances. Thus, Saranchak urges that the evidence could have been presented

10

in support of mitigation so that jurors might have chosen not to sentence him to death.

Saranchak's trial counsel introduced no expert medical testimony on Saranchak's behalf during the degree-of-guilt hearing. Instead, counsel called several of Saranchak's neighbors and other members of the community who had seen Saranchak and Miles on the day of the murders in an attempt to cast doubt on Miles's testimony, as well as to establish that Saranchak had been intoxicated that evening. Carol Frantz, Saranchak's girlfriend and the mother of two of his children, also testified that Saranchak had been drunk when he obtained the rifle from his stepfather's home, and that she had unsuccessfully tried to prevent him from leaving. But Saranchak persisted, pushing his girlfriend out of the way and claiming that he was "going spotting for a deer." App. 210. She also testified as to Saranchak's often strange behavior when he was under the influence of alcohol. According to Frantz, Saranchak "thought he was a sergeant when he was drunk" and would order her around. App. 213.

During the penalty phase, the Commonwealth sought to prove two aggravating factors under Pennsylvania law: (1) that Saranchak had killed his grandmother and uncle during the commission of a robbery and (2) that Saranchak had committed another murder at the time of the first murder. 42 Pa. Cons. Stat. Ann. § 9711(d)(6), (11). To that end, the Commonwealth called many of the same witnesses from the degree-of-guilt hearing, including Roy Miles, who again described the manner in which Saranchak committed the murders. The trial court also permitted Miles to invoke his Fifth Amendment privilege a second time regarding the

11

source of the money he had in his possession on the night of the murders. Miles did testify again that the money came from neither Saranchak nor the murder victims. Laurie Garber, the CYS caseworker, took the stand once again and repeated her testimony as to Saranchak's second confession.

Trial counsel's case in support of mitigation was perfunctory. Indeed, the transcript of the penalty phase hearing encompassing the testimony of witnesses called in support of mitigation comprised a mere 40 pages, inclusive of the Commonwealth's cross examination. Frantz, Saranchak's girlfriend, again testified on Saranchak's behalf, recounting much of the same testimony she gave during the degree-of-guilt hearing. Her testimony repeated that when Saranchak was drunk, "[h]e tries to be demanding," "he thinks he's a sergeant," and that he would tell her "that [she was] his private and he [was] [her] sergeant and [she] [would] obey his commands." App. 367. Further, she testified that Saranchak would not always remember these military episodes when he became sober. Counsel also called others who had testified during the degree-of-guilt phase and who had been with Saranchak on the night of the crimes, again focusing on Saranchak's intoxication that evening. Law enforcement and prison officials also described Saranchak as a cooperative inmate without disciplinary infractions.

Trial counsel also called Dr. Stefan Kruszewski, a court-appointed psychiatrist. Kruszewski had met with Saranchak only once, and only to evaluate Saranchak's "ability to assist in his defense, his competency to stand trial, and whether statements given to the police were voluntary or involuntary as the result of any psychiatric dysfunction."

12

*Saranchak I*, 616 F.3d at 299. Although Kruszewski had not yet been given the records that later were made available to him for PCRA purposes, Kruszewski testified during the penalty phase that he had evaluated Saranchak's background "[t]o the extent that [he] c[ould]." App. 389. But Kruszewski could not say specifically how alcohol might have affected Saranchak, on the night of the murders or in general. Kruszewski did report, however, that Saranchak had "one previous psychiatric hospitalization when [he] was 21 years of age" due to "a significant suicide attempt." App. 390. Further, Kruszewski knew from Saranchak's mother that Saranchak was "impulsive and had kind of a hot temper." *Id.* Nevertheless, Kruszewski described Saranchak as "extremely cooperative, polite[,] . . . very pleasant" and "very credible and very candid" during their conversation. App. 391. Significantly, on cross examination Kruszewski testified that Saranchak had "no major psychiatric diagnosis or any mental disability, . . . which would prevent him from comprehending the ability to defend himself with the help of his counsel." App. 394–95. After hearing this testimony, the jury concluded that the Commonwealth had proved both aggravating factors beyond a reasonable doubt. The jury found no mitigating factors. With two aggravating factors and no mitigating factors, death was mandatory. 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iv).

The PCRA hearing revealed what evidence could have been introduced not only during the degree-of-guilt hearing regarding Saranchak's intent, but also during the penalty phase to convince the jury to impose a sentence of life imprisonment. Kruszewski testified and acknowledged that he had possessed "almost none" of Saranchak's background

information at the time of his first evaluation beyond police reports regarding the murders, Saranchak's confession to police, as well as the criminal complaint. App. 792. Trial counsel had neither obtained nor produced for Kruszewski's review any of Saranchak's school records, medical records, or psychiatric records. Indeed, trial counsel never asked Kruszewski to conduct an evaluation of Saranchak for the purpose of mitigation. Nor had Kruszewski been informed specifically of Saranchak's military delusions, though he was aware of Saranchak's militaristic behavior during his confession to police.

Once Kruszewski was provided with the records of Saranchak's background, Kruszewski's evaluation of Saranchak changed dramatically. Kruszewski initially had observed an overall "pleasant" person without any "major psychiatric diagnos[es]." App. 391, 394. Now, he believed that Saranchak suffered from a "Jekyll and Hyde type syndrome" after consuming alcohol during which his pleasant demeanor would worsen significantly causing him to experience "specific delusions that are presumably a result of the alcohol." App. 802. Saranchak's psychiatric records also revealed a history of depression along with two hospitalizations, one for a previously disclosed suicide attempt and one for "a rehab experience." App. 805. Further, although Saranchak's alcohol usage had been discussed at trial, Kruszewski's revised opinion at the PCRA hearing indicated that Saranchak suffered from "a psychoactive . . . alcohol induced delusional disorder and alcohol induced depressive disorder when drinking" at the time of the killings. App. 808.

14

Dr. Harry Krop, a clinical psychologist, also testified on Saranchak's behalf during the PCRA hearing. His testimony further demonstrated the extensive evidence of mitigation that counsel could have introduced at trial, particularly regarding what Krop described as Saranchak's "chronic psychiatric disturbance." App. 666. Specifically, from the records of Saranchak's psychiatric hospitalizations along with records indicating that he had suffered from "atypical pervasive developmental disorder" as a child, Krop diagnosed Saranchak with adult attention deficit disorder. App. 640. Krop also concluded that Saranchak suffered from chronic polysubstance abuse. And Krop diagnosed Saranchak with a "depressive disorder," as well as a "personality disorder . . . with paranoid and anti-social features." App. 640–41. According to Krop, Saranchak's personality disorder had been "pervasive" since Saranchak's childhood. Krop also confirmed Saranchak's significant psychological problems while drinking, during which Saranchak's "distrustful" and "suspicious" tendencies manifested themselves into "a full blown paranoid disorder" or "a delusional disorder." App. 642–43. Like Kruszewski, Krop also described a "Jekyll and Hyde personality." App. 658. And Krop opined that Saranchak's thought processes were significantly impaired on the night of the murders themselves based on the alcohol that he had consumed. Combined with Saranchak's psychological issues, Krop also believed that at the time of the offense, Saranchak was experiencing an extreme mental or emotional disturbance.

Krop also gave detailed testimony as to what, in his view, produced these psychological difficulties. Beginning with Saranchak's "highly dysfunctional" family history, Krop

15

observed that Saranchak's biological father was an abusive alcoholic who had previously been incarcerated and that his mother had also been treated "for nerves and depression." App. 646, 651. According to Krop, that "abusive family" history was "a significant contributor" that "basically deformed Mr. Saranchak's overall personality and coping skills and problem solving skills." App. 647. When Saranchak began attending school, he was diagnosed with a developmental disorder and attended special education classes. As a result, Saranchak developed a "poor self-concept" and a "lousy perception" of himself. App. 652. Saranchak turned to alcohol and drugs in an attempt to self-medicate his mounting depression. He became a heavy drinker by the age of 14. But that substance abuse only set off a "spiraling effect" of increasing depression. App. 650, 652. Alcohol and other drugs thus became significant, unusually negative influences in Saranchak's life. Even his first criminal offense as a juvenile involved the theft of alcohol.

Eventually Saranchak unsuccessfully attempted to join the military in an effort to turn his life around. In Krop's view, this failure resulted in an even more pronounced downward spiral, contributing to Saranchak's "fantasy world about being in the military." App. 654. Yet the only psychological support Saranchak sought out or otherwise received was in "crisis situations" in connection with his suicidal tendencies. App. 656. None of this evidence was introduced at trial, nor was a psychiatrist or other medical professional retained specifically on Saranchak's behalf to probe these issues as they related to mitigation or Saranchak's intent when his crimes were committed.

16

Saranchak appeals the District Court's rejection of his claim that trial counsel's failure to procure this psychological evidence, coupled with counsel's failure to seek suppression of both Miles's testimony as well as Saranchak's confession to police, substantially impacted his degree of guilt and the trial court's conclusion that Saranchak had murdered his grandmother and uncle with premeditated intent. Saranchak further argues that his mental health background would also have substantially affected the jury's decision to sentence him to death. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## II.

The Sixth Amendment guarantees to every criminal defendant "the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right plays "a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275–76 (1942)). Accordingly, defendants are entitled to not just the assistance of counsel, but the *effective* assistance of counsel. The right to effective counsel is necessary to protect the "fundamental right to a fair trial" afforded to every person accused. *Id.* at 684.

The test for determining whether a criminal defendant has been denied that right is twofold. To establish that

17

counsel was constitutionally ineffective, "[a] petitioner must show that counsel's performance was deficient." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687). To meet this prong, Saranchak must demonstrate that his trial counsel's representation "fell below an objective standard of reasonableness" as defined by "prevailing professional norms." *Outten v. Kearney*, 464 F.3d 401, 414 (3d Cir. 2006) (emphasis omitted) (quoting *Strickland*, 466 U.S. at 687–88). Further, counsel's reasonableness is assessed "on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* (citing *Strickland*, 466 U.S. at 689).

In addition to objectively unreasonable conduct, a petitioner must also show that counsel's deficiency "prejudiced the defense." *Wiggins*, 539 U.S. at 521 (citing *Strickland*, 466 U.S. at 687). To meet this standard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A defendant need not prove that the evidence would have been insufficient if not for counsel's errors. *See Breakiron v. Horn*, 642 F.3d 126, 140 (3d Cir. 2011). Nor need a defendant prove "that counsel's deficient conduct more likely than not altered the outcome." *Strickland*, 466 U.S. at 693. But a defendant must demonstrate more than "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* Further, the prejudice inquiry focuses on "the effect the same evidence would have had on an unspecified, objective factfinder" rather than a particular decisionmaker in the case. *Saranchak I*, 616 F.3d at 309.

18

Because this case calls for the collateral review of two decisions by Pennsylvania state courts denying Saranchak postconviction relief, we must also consider for each claim whether the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, and 28 U.S.C. § 2254 require deference to the Pennsylvania Supreme Court's and the PCRA court's determinations of those claims. Section 2254 bars us from granting a writ of habeas corpus on Saranchak's behalf for any claim that was "adjudicated on the merits in State court proceedings unless the adjudication of the claim" meets either of two conditions. 28 U.S.C. § 2254(d). First, we may grant habeas relief if the State court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). A decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

By contrast, a decision involves an unreasonable application of clearly established law where a state prisoner shows "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103

19

(2011). Thus, a state court's application must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks omitted) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). We accord no deference to a state court's resolution of a claim if that resolution was contrary to or reflected an unreasonable application of clearly established Supreme Court precedent, and we review the underlying claim de novo. *Breakiron*, 642 F.3d at 138.

Second, habeas relief is available to Saranchak if the State court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). The State court's factual findings are "presumed to be correct," and Saranchak bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). But "even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2)." *Lambert v. Blackwell*, 387 F.3d 210, 235–36 (3d Cir. 2004).

### III.

Before applying these tenets to Saranchak's cumulative error claim, we must identify which errors potentially prejudiced Saranchak. As noted above, Saranchak argues that trial counsel was ineffective when he failed to seek suppression of Roy Miles's testimony. His theory is that

20

permitting Miles to testify despite his invocation of his Fifth Amendment rights violated Saranchak's Confrontation Clause rights. *See United States v. McGlory*, 968 F.2d 309, 344 (3d Cir. 1992) ("If a witness' invocation of her rights under the Fifth Amendment to the United States Constitution could interfere with a defendant's right to cross-examine, the district court must ensure that the invocation did not 'effectively . . . emasculate the right of cross-examination itself.'" (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). But we denied Saranchak's motion to include this claim in the COA.

Saranchak acknowledges this denial, yet he urges us to consider any prejudice stemming from the admission of Miles's testimony as part of his cumulative error claim. Because we denied a COA on Saranchak's Confrontation Clause claim, we lack jurisdiction to now reach the merits of that claim. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (certificate of appealability is a "jurisdictional prerequisite" and "until a COA has been issued[,] federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners").[6] If the admission of

---

[6] We denied a COA on this claim "[f]or substantially the reasons given by the District Court." App. 54. According to the District Court, the Pennsylvania Supreme Court's conclusion that Saranchak's Sixth Amendment claim lacked even "arguable merit" was both "consistent with federal law" and a "reasonable determination of the relevant facts." *Saranchak II*, 2012 WL 1414344, at *11 (quoting *Saranchak-Pa.*, 866 A.2d at 303). The District Court also noted that "[i]nasmuch as Miles' testimony should not have been

21

Miles's testimony did not violate Saranchak's Confrontation Clause rights, then the decision not to move to strike that testimony could not have contributed to any cumulative prejudice resulting from trial counsel's errors related to the degree-of-guilt phase. We therefore do not consider Miles's testimony as erroneously admitted for the purpose of assessing Saranchak's cumulative error claim.

Our analysis of Saranchak's cumulative error claim at the degree-of-guilt hearing is thus limited to the admission of his confession to police, combined with trial counsel's failure to introduce evidence of Saranchak's mental health background as it pertained to his intent. These claims of error raise several issues regarding the deference owed to the Pennsylvania state courts under AEDPA. Despite its relatively sparse discussion of Saranchak's cumulative error claim, the Pennsylvania Supreme Court rejected that claim on the merits. *See Priester v. Vaughn,* 382 F.3d 394, 398 (3d Cir. 2004) ("[T]he deferential standard of AEDPA applies even if the state court does not cite to any federal law as long as the state court decision is consistent with federal law."). Specifically, the Pennsylvania Supreme Court held that Saranchak's cumulative error claim failed because none of Saranchak's individual claims had merit. *Saranchak-Pa.*, 866 A.2d at 307.[7]

---

stricken, counsel cannot be faulted for his failure to move to strike it." *Id.*

[7] In doing so, the court cited its prior decision in *Commonwealth v. Rollins*, 738 A.2d 435 (Pa. 1999). *Rollins* held that "it is axiomatic that 'no quantity of meritless issues

22

As to those individual claims, the Pennsylvania Supreme Court resolved Saranchak's appeal regarding his attorney's failure to suppress his confession due to a failure to meet both *Strickland* prongs. First, the court held that counsel's strategy did not prejudice Saranchak because of the

can aggregate to form a denial of due process.'" *Id.* at 452 (quoting *Commonwealth v. Travaglia*, 661 A.2d 352, 367 (1995)). This conflicts with our previous recognition that "a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible" to determine whether together "they had a substantial and injurious effect or influence in determining the jury's verdict." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007); *see also Collins v. Sec'y of Pa. Dep't of Corrs.*, 742 F.3d 528, 542 (3d Cir. 2014) ("The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process."). There is some debate, however, as to whether cumulative error claims constitute clearly established federal law as determined by the Supreme Court for the purposes of deference under AEDPA. *See, e.g.*, *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (arguing post-AEDPA that "no Supreme Court precedent obligat[es] the state court to consider the alleged trial errors cumulatively"). We need not resolve this question because, even assuming that cumulative error claims are clearly established under Supreme Court case law, Saranchak's cumulative error claim fails to survive even de novo review.

23

"overwhelming evidence of [Saranchak's] guilt." *Id.* at 301. Second, the Pennsylvania Supreme Court agreed with the PCRA court's finding that Saranchak had "specifically directed [trial counsel] not to pursue the suppression issue." *Id.* at 302 n.12. For that reason, "counsel had a reasonable basis in following his client's instructions" and thus the failure to seek suppression did not constitute deficient conduct. *Id.*[8]

We previously agreed with the court's assessment of prejudice as to Saranchak's first confession. Although Saranchak's confession to police supported the Commonwealth's theory that the killing of his uncle was premeditated and deliberate, the other evidence in the case demonstrated that trial counsel's failure to seek suppression of this confession did not create a reasonable probability that an objective factfinder would have come to a different conclusion. *Saranchak I*, 616 F.3d at 307. The evidence unaffected by Saranchak's first confession included Miles's testimony regarding the manner in which the crimes were committed, "the physical evidence, including the nature of the wounds and the fact that the shell casing was found under Edmund's body," as well as Garber's properly admitted testimony concerning Saranchak's second confession. *Id.*

---

[8] The Pennsylvania Supreme Court's conclusion that counsel did not act unreasonably in following his client's instructions arguably requires deference under AEDPA. But we need not consider the reasonableness of counsel's conduct regarding Saranchak's cumulative error claim because he fails to demonstrate cumulative prejudice even under de novo review.

24

That body of evidence also undercut any conceivable impact of Saranchak's mental health history at the degree-of-guilt hearing. We previously noted that the Pennsylvania Supreme Court had erroneously applied "a *subjective* review of the evidence introduced at the PCRA hearing and analyzed the effect it would have had on the judge presiding, and acting as factfinder, at the degree of guilt hearing." *Id.* at 309 (emphasis added). Reviewing that evidence de novo, we nevertheless concluded that "[t]he Commonwealth presented overwhelming evidence of Saranchak's specific intent to murder Edmund and Stella at the degree of guilt hearing." *Id.* But our consideration of Saranchak's mental health was limited to whether there was a reasonable probability Saranchak would have been able to make out a defense of diminished capacity under Pennsylvania law. Krop's extensive testimony, as well as most of Kruszewski's testimony as to Saranchak's general mental health, were irrelevant to that defense. *See id.* at 313 (noting that evidence of Saranchak's "auditory hallucinations, schizoaffective disorder, delusion, pathological paranoia, and a tenuous ability to apprehend reality" was irrelevant to a diminished capacity defense (citing *Commonwealth v. Kuzmanko*, 709 A.2d 392 (Pa. Super. Ct. 1998))).

Thus, we have not previously considered trial counsel's failure to present evidence of Saranchak's mental health history in conjunction with the potentially erroneous admission of Saranchak's confession to police as they relate to Saranchak's intent. Nor did we consider what impact the evidence of Saranchak's psychological problems would have had on a finding of premeditated intent, as opposed to diminished capacity. Although the Pennsylvania Supreme

25

Court and the PCRA court rendered opinions as to both the availability of a cumulative error claim as well as the merits of the individual errors comprising Saranchak's claim, we need not resolve whether deference is owed to any state court on the impact of trial counsel's alleged errors during the degree-of-guilt phase. Even assessing those errors de novo, we conclude that Saranchak has not established prejudice.

As we did in *Saranchak I*, we "must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied." 616 F.3d at 311 (quoting *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999)). The untainted evidence of Saranchak's intent was extensive. *See id.* (listing evidence supporting Saranchak's intentional killing of his grandmother and uncle). Miles's testimony at trial indicated that Saranchak had concocted a plot to rob his grandmother, all the while acknowledging that someone might be shot in the process. Saranchak then acquired the murder weapon from his stepfather's home, falsely informing his family that he was merely going hunting. Saranchak then shot both his grandmother and his uncle in the head. Even excluding Saranchak's confession to the police concerning his uncle's murder, Saranchak separately confessed in even greater detail to Laurie Garber. That confession not only admitted his role in the deaths of Saranchak's grandmother and uncle, it included an expression of motive for both killings. Whether the factfinder was aware that Saranchak had confessed twice or only once, Saranchak's more detailed confession to Garber in her CYS capacity would have had a similarly powerful impact.

Further, although the expert medical testimony at the

26

PCRA hearing regarding Saranchak's mental health history was relevant to whether Saranchak actually had formed the premeditated intent to murder his grandmother and uncle, that historical evidence was far outweighed by the evidence of Saranchak's state of mind on the night of the crimes. Indeed, as we explained in *Saranchak I*, "the verdict from the degree of guilt hearing had 'overwhelming record support.'" *Id.* (quoting *Strickland*, 466 U.S. at 696). Our assessment of the evidence presented to the trial court has not changed. Even reconsidering the impact of trial counsel's errors in the aggregate, those errors did not contribute to a reasonable probability of a different outcome given the strength of the Commonwealth's case. Accordingly, we will affirm the District Court's denial of Saranchak's cumulative error claim.

## IV.

We next consider Saranchak's penalty phase claims. Before addressing the merits, however, we consider whether those claims are moot. On February 13, 2015, recently-inaugurated Pennsylvania Governor Tom Wolf declared a moratorium on the death penalty in Pennsylvania. Although neither party here contests justiciability, "[w]e have an independent obligation at the threshold to examine whether we have appellate jurisdiction." *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007).

The question we address is whether "changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Id.* (quoting *In re Surrick*, 338 F.3d 224, 230 (3d Cir. 2003)). The Governor's moratorium did not abolish the death penalty

27

in Pennsylvania. Further, one of the parties in this case, the Attorney General of Pennsylvania, is seeking to have Pennsylvania's courts lift the moratorium as an unconstitutional exercise of the Governor's authority under Pennsylvania law. So not only does an Article III case or controversy remain, the parties have demonstrated "sufficient functional adversity to sharpen the issues for judicial resolution." *In re Surrick*, 338 F.3d at 229-30 (quoting *Int'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987)). Under these circumstances, the moratorium does not affect our jurisdiction. Saranchak's penalty phase claims are not moot.

## A.

At the penalty phase, we first confront whether the decision of Saranchak's trial counsel not to pursue further his client's mental health and behavioral history was reasonable under *Strickland*'s first prong.[9] The Pennsylvania Supreme

---

[9] Saranchak claims that his trial counsel was constitutionally ineffective both because he did not investigate mitigating circumstances and because he failed to secure an expert to opine on Saranchak's mental health pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985). In this case, we consider trial counsel's failure to retain a mental health expert to be one of many potential investigative steps subsumed within Saranchak's general failure to investigate claim. Indeed, the Pennsylvania Supreme Court also considered Saranchak's *Ake* claim to be "merely a restatement of [Saranchak's] initial contention of ineffectiveness of trial counsel for failing to obtain prior school, mental health and hospital records."

Court, in disagreement with the PCRA court, concluded that trial counsel ended his investigation at a reasonable point. Specifically, the Pennsylvania Supreme Court placed the blame for trial counsel's failure to obtain evidence of Saranchak's background on Saranchak, his girlfriend, and his mother. Those three individuals "failed to provide" trial counsel with information regarding Saranchak's background, which the Pennsylvania Supreme Court characterized as "a specific requirement of *Strickland.*" *Saranchak-Pa.*, 866 A.2d. at 304 n.14. For that reason, in the Pennsylvania Supreme Court's view, "at the time of the penalty hearing, counsel was not privy to [Saranchak's] background information." *Id.* (emphasis omitted). Thus, because "counsel's strategic decision [not to investigate further] was premised upon all of the information he had available to him," the court concluded that trial counsel's behavior was reasonable. *Id.* at 304.[10]

---

*Saranchak-Pa.*, 866 A.2d at 305. Therefore, our resolution of Saranchak's claim regarding trial counsel's failure to investigate includes Saranchak's claim under *Ake*.

[10] The Pennsylvania Supreme Court declined separately to analyze Saranchak's *Ake* claim, instead holding that it failed "because, for all the reasons set forth *supra*, even assuming *arguendo* the records would have been obtained and an independent psychiatrist retained, the end result of this case would have been no different." *Saranchak-Pa.*, 866 A.2d at 305. Although this statement is couched in terms of prejudice, the Pennsylvania Supreme Court's resolution of Saranchak's penalty phase claims turned on the purported reasonableness of counsel's investigation, not prejudice.

29

Given this resolution on the merits as to whether counsel's conduct was constitutionally sufficient, we apply a "doubly deferential standard," both as to whether counsel's conduct was reasonable as well as to the Pennsylvania Supreme Court's treatment of the issue. *Breakiron*, 642 F.3d at 141–42 (citing *Harrington*, 562 U.S. at 105). Nevertheless, the Pennsylvania Supreme Court's conclusion rests on the premise that counsel was unaware from sources beyond Saranchak and his family that further investigation was required. The evidence before the Pennsylvania Supreme Court clearly and convincingly demonstrates that this premise was false. Far from lacking any information regarding Saranchak's background and the need for further investigation, trial counsel admitted during the PCRA hearing that his theory of defense focused on "the mental health issue" regarding Saranchak. App. 698. Trial counsel was also aware from multiple sources that Saranchak had demonstrated psychological issues, "at times" adopting "a character or mode" that Saranchak was in the military, which struck counsel as "odd." App. 700. Trial counsel's testimony at the PCRA hearing was not specific concerning the source from whom he learned about Saranchak's militaristic behavior. But the record demonstrates that he would have learned of that behavior at least from the police report regarding Saranchak's first confession as well as from

Accordingly, like Saranchak's general penalty phase failure to investigate claim, we do not believe the Pennsylvania Supreme Court reached prejudice as to Saranchak's penalty phase *Ake* claim. Nevertheless, as discussed *infra*, the PCRA court reached prejudice pursuant to *Ake*.

30

Saranchak's girlfriend. Further, counsel testified that he "had asked some of the people when [he] was interviewing them around this time" about Saranchak's military delusions. *Id.* Thus, according to counsel, he sought a medical professional to evaluate whether Saranchak had "any psychiatric problems," including schizophrenia and paranoia, or "whether there was anything abnormal," as well as whether Saranchak was "understanding, whether he was competent to stand trial, competent to testify, [and] competent to help [counsel]." App. 700–01.

Despite this testimony, counsel did not obtain a full psychiatric evaluation for that purpose. Indeed, trial counsel never retained a defense expert on Saranchak's behalf, notwithstanding his belief that Saranchak's mental health was important to his case. Instead, counsel relied on Kruszewski, a neutral expert appointed to evaluate Saranchak's competency to stand trial, for Saranchak's only pretrial mental health evaluation. Yet Kruszewski had not been appointed to evaluate Saranchak's background, history, or general mental health as those factors might have pertained to mitigation, nor had counsel asked Kruszewski to conduct such an evaluation. Trial counsel had never even provided Kruszewski with Saranchak's medical records or mental health background, information that Kruszewski opined would have been necessary to conduct a more general clinical evaluation beyond Saranchak's competency. Although counsel explained at the PCRA hearing that Kruszewski's "glowing" opinion of Saranchak persuaded him not to pursue Saranchak's mental health further, App. 703, it was not strategically reasonable for counsel to cite Kruszewski's opinion of Saranchak's competency as a basis for ruling out

31

further investigation of Saranchak's mental health as it related to mitigation.

Indeed, despite Kruszewski's initially positive impression of Saranchak, the report Kruszewski gave to trial counsel revealed significant red flags—red flags which suggested that further investigation was warranted. That report showed that "Saranchak stated that he was previously treated at the Pottsville Hospital and Warne Clinic" and that "he was treated for one month under the care of Dr. Richard Wagner." *Saranchak v. Beard*, No. 05-cv-00317, Appendix by Daniel Saranchak, Ex. 1, at 6 (M.D. Pa. June 22, 2005) (Docket No. 9) (hereinafter "Kruszewski Rep."). Saranchak had also previously ingested "250 pills" in response to his wife's affair, although Saranchak "did not admit to a previous suicide attempt." *Id.* at 5, 8. Kruszewski concluded from his meeting with Saranchak that he was competent to stand trial, but noted that Saranchak appeared to suffer from a "[p]ersonality disorder, . . . with anti-social traits." *Id.* at 9. Given that all of this information was available to trial counsel at the time he chose to end his investigation, the Pennsylvania Supreme Court's finding that trial counsel was "not privy to" enough background information, *Saranchak-Pa.*, 866 A.2d. at 304 n.14, was incorrect by "clear and convincing evidence," § 2254(e)(1), and reflects "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

Further, the Pennsylvania Supreme Court's analysis was an objectively unreasonable application of *Strickland*'s requirements pursuant to § 2254(d)(1). Nowhere in

32

*Strickland* or in any other case has the Supreme Court stated that trial counsel need pursue mitigation evidence related to a defendant's mental health only if a defendant or his family specifically informs counsel of the defendant's background, despite trial counsel's existing knowledge that his client's mental health was a significant issue. To the contrary, *Strickland* states that "a particular decision not to investigate must be directly assessed for reasonableness *in all the circumstances*, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691 (emphasis added). Thus, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. We acknowledge that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions," and in certain cases may be determinative. *Id.* at 691. But a defendant's failure personally to inform his counsel of possible avenues of investigation does not absolve his attorney from pursuing those avenues, particularly where counsel is already aware of facts demonstrating that such an investigation may be fruitful.

Indeed, the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), is instructive, and was available to the Pennsylvania Supreme Court at the time of its decision. Like Saranchak's claim of error here, *Wiggins* involved an ineffectiveness claim "stem[ming] from counsel's decision to limit the scope of their investigation into potential mitigation evidence." *Id.* at 521. Counsel in *Wiggins* had obtained some information of the defendant's troubled past through a presentence investigation report, certain social service

33

records, and a number of tests conducted by a psychologist. *Id.* at 523–24. Yet "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources," *id.* at 524, and despite having uncovered "no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless," *id.* at 525. By failing to consider "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further," the conclusion of the Maryland Court of Appeals that counsel's investigation was strategically permissible was thus an objectively unreasonable application of Supreme Court precedent. *Id.* at 527–28.

So too here. Both we and the Supreme Court have often considered the American Bar Association's ("ABA") guidelines regarding the conduct of capital counsel to assess counsel's performance. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 524 (noting that the Supreme Court "long ha[s] referred" to "the standards for capital defense work articulated by the [ABA] . . . as 'guides to determining what is reasonable'" (quoting *Strickland*, 466 U.S. at 688)); *Williams*, 529 U.S. at 396; *Blystone v. Horn*, 664 F.3d 397, 419–20 (3d Cir. 2011); *Bond v. Beard*, 539 F.3d 256, 288 (3d Cir. 2008); *Outten*, 464 F.3d at 417; *see also Strickland*, 466 U.S. at 688 (noting that "[p]revailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable, but they are only guides" (citation omitted)). Those guidelines provide that investigations into mitigating

evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") 11.4.1(C), at 93 (1989)).[11] Further, "[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." ABA Guidelines 11.4.1(C). As the commentary to the ABA Guidelines explains, "[c]ounsel's duty to investigate is not negated by the expressed desires of a client." ABA Guidelines 11.4.1, commentary. That investigation should include a defendant's medical history, educational history, military history, family and social history, and prior adult and juvenile record. *Id.* 11.4.1(D)(2)(C). Defense counsel should also retain an expert "where it is necessary or appropriate for . . . presentation of mitigation." *Id.* 11.4.1(D)(7)(D); *see also Holland v. Horn*, 519 F.3d 107, 113 (3d Cir. 2008) ("[U]nder *Ake*, 'when a capital defendant demonstrates that his mental condition is a *significant factor* at his sentencing phase, he is entitled to the assistance of a psychiatrist . . . .'" (second alteration in original) (quoting *United States v. Roman*, 121 F.3d 136, 144 (3d Cir. 1997))).

Counsel's investigation here fell woefully short, under standards expressed both in clear Supreme Court precedent

---

[11] The ABA updated its guidelines for defense counsel in capital cases in 2003. But because trial counsel's conduct occurred in 1994, we look to the guidelines promulgated in 1989.

35

and as set forth by the ABA's professional guidelines. Further, given counsel's failure to investigate despite his awareness of the significance to the defense of Saranchak's mental health, we are convinced that "there is no possibility fairminded jurists could disagree" that counsel's conduct was unreasonable. *Harrington*, 562 U.S. at 102. Even assuming the Pennsylvania Supreme Court was correct that counsel learned nothing from Saranchak, his girlfriend,[12] or his mother regarding Saranchak's mental health, his abusive upbringing, or his dysfunctional family, counsel nevertheless learned from Kruszewski about Saranchak's previous psychiatric hospitalization as well as his suicide attempt and depression. Counsel himself also acknowledged that he believed Saranchak's mental health was a major issue in the case. And counsel was aware of Saranchak's militaristic posture during his confession. Yet counsel did not retain an expert on Saranchak's behalf or seek further medical evaluation. Instead, counsel was content with the court-appointed expert's investigation of only Saranchak's competency to stand trial. Counsel did not even obtain the records regarding the psychiatric hospitalization that was reflected in Kruszewski's report, much less Saranchak's school records or other hospitalization records. Even the Commonwealth conceded in its brief and at oral argument that trial counsel's investigation was inadequate.

---

[12] Saranchak's girlfriend stated repeatedly at trial that Saranchak believed he was a military sergeant when he was drinking. That unusual behavior should have given trial counsel some indication that further psychological inquiry was called for.

Accordingly, we conclude that trial counsel's performance at the penalty phase was unreasonably deficient, and the Pennsylvania Supreme Court's conclusion to the contrary was objectively unreasonable.

**B.**

We turn then to whether counsel's failure to investigate and present Saranchak's mental health history prejudiced Saranchak. As noted above, the Commonwealth had proven beyond a reasonable doubt that Saranchak had committed the murders in the course of a robbery and that his crime involved the murder of two people, both aggravating circumstances under Pennsylvania law. 42 Pa. Cons. Stat. Ann. § 9711(d)(6), (11). A sentence of death is mandatory "if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." § 9711(c)(1)(iv). The Commonwealth must prove aggravating circumstances beyond a reasonable doubt, but a defendant need prove mitigating circumstances by only a preponderance. § 9711(c)(1)(iii). Death sentences in Pennsylvania must be unanimous. That means that Saranchak would have been sentenced to life imprisonment—not death—if even one juror had found that the aggravating circumstances did not outweigh any mitigating circumstances. § 9711(c)(1)(iv); *see also Jermyn v. Horn*, 266 F.3d 257, 309 (3d Cir. 2001) (prejudice can be shown if there is a reasonable probability that one juror would not have sentenced defendant to death). Here, Saranchak sought to prove that his capacity "to appreciate the criminality of his

37

conduct or to conform his conduct to the requirements of law was substantially impaired." § 9711(e)(3). Further, Saranchak sought to prove the "catchall" mitigating circumstances for "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." § 9711(e)(8).

The Pennsylvania Supreme Court did not reach *Strickland*'s prejudice prong as to Saranchak's penalty phase claims. But the PCRA court held that Saranchak suffered no prejudice at the penalty phase stemming from trial counsel's failure to introduce the evidence of Saranchak's mental health revealed post-trial. *Saranchak-PCRA*, No. 889, 889A-1993, at 17–18.[13]  "The lack of an express ruling from the Pennsylvania Supreme Court on the question of prejudice does not negate the PCRA court's decision that [Saranchak] was not prejudiced." *Collins*, 742 F.3d at 546. Thus, we must view the PCRA court's conclusion on that prong through AEDPA's lens. *Id.*

For Saranchak's penalty phase claim, the PCRA court correctly described the standard for prejudice under

---

[13] The PCRA court also concluded that Saranchak had failed to establish prejudice as to his *Ake* claim based on the PCRA court's "resolution of the previous allegations of ineffectiveness related to the presentation of the diminished capacity defense and mitigation evidence." *Saranchak-PCRA*, No. 889, 889A-1993, at 17. Our analysis of the prejudice Saranchak suffered at the penalty phase of his trial from counsel's failure to investigate mitigating circumstances thus includes prejudice stemming from his claim under *Ake*.

*Strickland* as requiring Saranchak to show "the reasonable probability that, absent trial counsel's failure to present mitigating evidence, he would have been able to prove at least one mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)." *Saranchak-PCRA*, No. 889, 889A-1993, at 16 (quoting *Commonwealth v. Ford*, 809 A.2d 325, 332 (Pa. 2002)). At other points in its opinion, the PCRA court also described the prejudice inquiry as analyzing whether "there is a reasonable probability that the outcome of the proceedings would have been different" if counsel had not been ineffective. *Id.* at 3, 6 (quoting *Commonwealth v. Marshall*, 812 A.2d 539, 545 (Pa. 2002)).

Much of the PCRA court's analysis regarding Saranchak's psychological problems related to the evidence of Saranchak's intent produced at trial in comparison with Kruszewski's opinion at the PCRA hearing. In Kruszewski's view, Saranchak had been "acutely intoxicated at the time of the killings and was actively delusional, believing that he was on a military mission." *Saranchak-PCRA*, No. 889, 889A-1993, at 17. Thus, Kruszewski had opined that Saranchak had suffered from an "extreme mental or emotional disturbance" at the time of the killings, and that his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" had been substantially impaired. *Id.* The PCRA court rejected this testimony, holding that Kruszewski's opinion was "completely incredible and deserving of no weight" on this point given the evidence at trial of Saranchak's deliberate, non-delusional conduct. We agree that the Commonwealth's

39

evidence of Saranchak's intent and lack of "substantially impaired" capacity was generally strong for the same reasons that we rejected Saranchak's degree-of-guilt cumulative error claim. The PCRA court's finding that Kruszewski was not credible as to whether Saranchak could have established the existence of these mitigating circumstances thus deserves deference.

But the PCRA court also observed that the evidence of Saranchak's mental health produced at the PCRA hearing "could have satisfied the catchall mitigating circumstance" permitting the jury to consider any aspects of Saranchak's character, record, or the circumstances of the offense. § 9711(e)(8). Nevertheless, the PCRA court summarily rejected Saranchak's argument that there was a reasonable probability the outcome would have been different, even if Saranchak could have proven the existence of the catchall mitigating circumstance by a preponderance of the evidence. *Saranchak-PCRA*, No. 889, 889A-1993, at 18. Noting that the jury would still have been required to weigh Saranchak's mental health and background against the aggravating circumstances, the PCRA court concluded that "[u]nder the circumstances of this case, we do not believe that . . . the existence of the catchall mitigating circumstance *would have swayed* even one member of the jury to render a sentence of life imprisonment rather than death." *Id.* (emphasis added). The PCRA court did not discuss Kruszewski's changed diagnosis of Saranchak's general mental health beyond whether Saranchak's crimes were intentional on the night of the killings. And inexplicably, the PCRA court failed to even mention the diagnoses provided by Dr. Krop. Likewise, the PCRA court did not mention any of the other additional

40

witnesses who testified or submitted affidavits at the PCRA hearing on Saranchak's behalf.

Although the PCRA court had previously recited the correct standard to determine whether Saranchak suffered prejudice, its ostensible application of that standard raises serious doubt that the correct analysis was in fact undertaken. The test for prejudice in this context is not whether Saranchak "*would have swayed* even one member of the jury to render a sentence of life imprisonment rather than death," as the PCRA court stated. *Saranchak-PCRA*, No. 889, 889A-1993, at 18 (emphasis added). Formulating the test in that fashion places a higher burden on Saranchak than *Strickland* requires. Indeed, *Strickland* makes clear that the prejudice inquiry focuses on whether the defendant has shown merely "a reasonable probability" that the outcome would have been different absent counsel's errors. *Strickland*, 466 U.S. at 694. If the PCRA court indeed applied a heightened, outcome-determinative standard, its analysis would thus reflect a misapplication of *Strickland*.

Nor was this the PCRA court's only misstatement of the law. When it analyzed prejudice in relation to the failure to suppress Saranchak's first confession to police, the PCRA court used similarly erroneous language. The PCRA court concluded that even if trial counsel had been deficient in failing to pursue that argument, "the outcome of the degree of guilt hearing *would not have been different*" and thus Saranchak suffered no prejudice. *Saranchak-PCRA*, No. 889, 889A-1993, at 11–12 (emphasis added). Moreover, the PCRA court apparently reached that conclusion because "[t]he Commonwealth's evidence against [Saranchak],

41

exclusive of his incriminating statements to police, *was sufficient to establish his guilt* of first degree murder beyond a reasonable doubt." *Id.* at 12 (emphasis added). This too was error, given that *Strickland* prejudice does not depend on the sufficiency of the evidence despite counsel's mistakes. *See Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. And although the PCRA court did not reach prejudice related to the failure to suppress Saranchak's confession to the CYS caseworker, had it done so the PCRA court stated that it would have analyzed "whether the outcome would have been different if the statements would have been suppressed." *Saranchak-PCRA*, No. 889, 889A-1993, at 13. None of these statements are accurate characterizations of the law.

Despite these inaccuracies, we must presume "that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Section 2254 also requires us to apply a "highly deferential standard for evaluating state-court rulings" and give state court decisions "the benefit of the doubt." *Id.* (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997) (internal quotation marks omitted)). Because the PCRA court in other areas of its opinion correctly described the prejudice standard when it quoted the law generally applicable to ineffectiveness claims, whether it actually applied a standard contrary to clearly established federal law is not entirely clear. Nevertheless, the PCRA court's repeated

42

misstatements of the law, particularly its application at one point of a sufficiency of the evidence test to demonstrate that the outcome "would not have been different," *Saranchak-PCRA*, No. 889, 889A-1993, at 12, indicate to us that the PCRA court misapprehended *Strickland*'s prejudice prong.

We concluded in *Breakiron v. Horn*, 642 F.3d 126, 140 (3d Cir. 2011), that a similar method of analysis was both "contrary to and an unreasonable application of *Strickland*." *Breakiron* called for the Pennsylvania Supreme Court to determine whether counsel's failure to request a lesser-included offense instruction had prejudiced his client. *Id.* We did not defer to the Pennsylvania Supreme Court's resolution of that issue because it had "partial[ly] reli[ed]" on a "sufficiency of the evidence standard" without weighing the evidence as a whole "to determine whether there was a reasonable probability" that the outcome would have been different. *Id.* To be sure, the PCRA court here did not state expressly that it was relying on a sufficiency determination in conducting its prejudice analysis of Saranchak's penalty phase claims. But the PCRA court did make its sufficiency analysis explicit in other parts of its opinion, and one would not expect the PCRA court to apply two different methods of analysis to determine whether Saranchak suffered prejudice from his different claims of ineffectiveness. Accordingly, we believe that the PCRA court was consistent in its prejudice analysis and that its application of a sufficiency standard to determine prejudice as to one of Saranchak's degree-of-guilt phase claims means that it applied a similarly erroneous standard to Saranchak's penalty phase claim. Thus, at the very least, the PCRA court's analysis constituted an unreasonable application of clearly established federal law

43

under § 2254(d)(1). *See also Hummel v. Rosemeyer*, 564 F.3d 290, 305 (3d Cir. 2009) (holding that a state court's holding was contrary to clearly established Supreme Court law where the state court concluded that a defendant suffered no prejudice because he "failed to show the examination would have established [he] was incompetent to stand trial") (emphasis omitted).

The PCRA court's failure to discuss the vast majority of the relevant evidence presented at the PCRA hearing further buttresses our conclusion that its analysis was unreasonable. The proper prejudice analysis would have required the PCRA court "to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98. Yet the PCRA court did not discuss Krop's testimony, or Kruszewski's testimony as it related to Saranchak's mental health generally as opposed to his behavior on the night of the murders. Instead, the PCRA court brushed aside Saranchak's childhood and mental health problems without analysis, despite the fact that the jury "heard almost nothing that would humanize [Saranchak] or allow them to accurately gauge his moral culpability." *Porter v. McCollum*, 558 U.S. 30, 41 (2009).

Here, the PCRA hearing revealed that Saranchak's troubled past and psychological problems were significant factors affecting his life. Yet the testimony that the jury considered at trial only hinted at Saranchak's substance abuse and his alcohol-induced military fantasies. Indeed, the depth of Saranchak's problems were made apparent only after

44

Saranchak's hospital and school records were obtained and an expert was finally retained on Saranchak's behalf to opine on mitigating circumstances. None of Saranchak's major psychological diagnoses were revealed to the jury. Kruszewski, unaware of the magnitude of Saranchak's troubled past, instead testified that Saranchak suffered "no major psychiatric diagnosis." App. 394. Far from "barely . . . alter[ing] the sentencing profile presented to the sentencing judge," *Strickland*, 466 U.S. at 700, the differences between the portrait of Saranchak's troubled life that could have been presented to the jury and the one actually presented were stark. The PCRA court's conclusion, without analysis, that not even one juror "would have [been] swayed," *Saranchak-PCRA*, No. 889, 889A-1993, at 18, indicated the PCRA court either "did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing," *Porter*, 558 U.S. at 42. Indeed, given that death sentences must be unanimous under Pennsylvania law, 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iv), "persuading even one juror to vote for life imprisonment could have made all the difference." *Outten*, 464 F.3d at 422. Accordingly, we conclude that the evidence at the PCRA hearing satisfied *Strickland*'s prejudice prong, and the PCRA court's analysis was an unreasonable application of clearly established Supreme Court case law.

## V.

For these reasons, we will affirm that part of the District Court's judgment denying Saranchak's petition for habeas corpus due to trial counsel's cumulative errors at his degree-of-guilt hearing. We will reverse in part the judgment

45

of the District Court and remand with instructions to grant a provisional writ of habeas corpus directed to the penalty phase. Unless the Commonwealth of Pennsylvania conducts a new sentencing hearing, Saranchak shall be sentenced to life imprisonment.